Jacqueline CAMPBELL, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. 3:99CV386 (JBA).

United States District Court, D. Connecticut.

Nov. 30, 2001.

Allan B. Rubenstein, New Haven, CT, for plaintiff.

Jacqueline Campbell, Bridgeport, CT, pro se.

Ann M. Nevins, U.S. Attorney's Office, Bridgeport, CT, Deirdre Anne Martini, Ivey, Barnum & O'Mara, Greenwich, CT, for defendant.

*Ruling on Pending Motions*
*[Doc. ## 22, 25, & 27]*

ARTERTON, District Judge.

Jacqueline Campbell filed this action under 42 U.S.C. § 405(g), seeking reversal of the final decision of the Commissioner of Social Security, which denied her claim for disability insurance benefits.

Campbell filed a motion for an order reversing the decision of the Commissioner, or in the alternative, remanding for a new hearing [Doc. # 22]. The Commissioner moved to affirm the final decision of the Commissioner [Doc. # 25], and later to dismiss for failure to prosecute [Doc. # 27].

The motions were referred to Magistrate Judge Joan Glazer Margolis, who issued a recommended ruling affirming the Social Security Commissioner's denial of Campbell's claim. Campbell has filed objections to the Magistrate Judge's recommendation.

## I. Factual Background and the Proceedings Below

Jacqueline Campbell is 41 years old.[1] She attended college for one year in the late 1970s or 1980,[2] and she has worked at various companies performing data entry and other related tasks.[3] Campbell stopped working either in 1990 or 1992.[4]

It is undisputed that Campbell suffered from congestive heart failure, oxygen-dependant emphysema, sleep apnea and morbid obesity in 1995, and continues to suffer from those illnesses.[5] While not part of the official record below, both parties have noted that Campbell currently receives Supplemental Security Income (SSI) benefits by virtue of her disabilities.[6]

### A. Proceedings Before the ALJ

Campbell filed an application for disability insurance benefits on June 27, 1995.[7] In order to qualify, she must have been disabled on or before June 30, 1993, the last date she was insured.[8]

Her claim was initially denied, and a hearing was held at which Campbell gave testimony about her ailments and several medical records were offered into evidence. These included prescription pill bottles from 1993, several records of visits to the emergency room, and records from Campbell's treating physician, R. Scott Prewitt, M.D.

Campbell's claim for benefits was severely complicated by the fact that she has few medical records prior to June 30, 1993, the operative date for Social Security purposes. Campbell explained that because her physicians in the early 1990s, Drs. Gulash and Dugas, were retired by the time she filed for benefits, they did not maintain offices or records of treatment any longer.[9] Campbell also testified at the

---

1. Certified Transcript of Administrative Proceedings, filed September 1, 2000 ("Tr.") 44 (showing Campbell's date of birth as August 11, 1960).

2. Tr. 71.

3. Tr. 71.

4. Campbell stated at the hearing that she last worked in 1990, and no earnings were reported after 1990. Tr. 33. On her disability application, however, she indicated that she stopped working on March 1, 1992, which corresponds exactly with the date Campbell claims she became disabled.

5. Tr. 137 (Dr. Prewitt's letter to the ALJ describing Campbell's 1995 diagnoses of oxygen-dependent emphysema, sleep apnea, morbid obesity and congestive heart failure, and reporting "profound" physical limitations). *See also* Tr. 30 (transcript of hearing before ALJ on June 7, 1996) ("ALJ: Now, Miss

Campbell, I don't think there is, based on the various ailments you have, and your weight, and put everything together I think, I don't think there's much doubt [you are] disabled right now.").

6. Mem.Supp.Pl.'s Mot. (Dec. 29, 2000) 3 n. 2; Def.'s Mem.Supp.Mot. (Jan. 30, 2001) 6 n. 2.

7. Tr. 44 (Application for Disability Insurance Benefits).

8. Tr. 63 (noting disability date last insured as 6/93). As Magistrate Judge Margolis noted in her recommended ruling, throughout his decision the ALJ indicated that the last day Campbell was insured was June 30, 1996. Tr. 21. However, in light of the other references throughout the record, it is a reasonable conclusion that this is a typographical error, and the correct date is June 30, 1993. *See, e.g.,* Tr. 30.

9. Tr. 42.

hearing that when she sought medical treatment, her physicians were dismissive of her complaints and all offered the same advice, which was to lose weight.[10] The true nature of her illness, she claims, was thus not reflected in her medical records until 1995.

In order to partially compensate for the lack of pre-June 30, 1993 medical records and at the suggestion of the ALJ,[11] Campbell sought and obtained a retrospective opinion from Dr. Prewitt. Dr. Prewitt opined that it was reasonably medically probable that her congestive heart failure began prior to June 30, 1993, and that Campbell thus was disabled within the meaning of the Social Security Act prior to that date.[12]

Dr. Prewitt undisputably had a treating relationship with Campbell: the record contains twenty-two dated entries (presumably corresponding to as many visits) on eight pages of office notes spanning from June 3, 1995 to May 13, 1996.[13] Dr. Prewitt's terse letter to the ALJ is, however, not a model of clarity: "In response to your letter of July 3, 1996, given Ms. Campbell's testimony per your letter, it is in reasonable medical probability that her congestive heart failure began prior to June 30, 1993. It follows then that she satisfies social security disability regulations definition of disability prior to

6/30/93." [14] While the office notes he enclosed with his November 1995 letter document the substantial treating relationship and data available to Dr. Prewitt as background for his conclusion as to the likely onset date of Campbell's congestive heart failure, Dr. Prewitt's letter of July 17, 1996 specifically references only "Campbell's testimony per your letter" as the basis of his opinion.[15]

The ALJ denied Campbell's claim, holding that she had not come forward with evidence that she suffered disabling restrictions or limitations on or before June 30, 1993.[16] In his ruling, he explained that Dr. Prewitt's retrospective opinion was not "entitled to much weight" because "the treatment relationship did not begin until 1995," and Dr. Prewitt's conclusion about the severity of Campbell's condition in 1993 was "not based on medical findings, but instead ... on the claimant's testimony, which the [ALJ] finds less than fully credible." [17]

The ALJ explained that he did not believe Campbell's testimony about the severity her illness because "[a] person with impairments as severe as those the claimant alleged, especially considering they allegedly prevented her from working, would be seeking medical attention and there would be contemporary medical records of

10. Tr. 40 ("[Campbell:] Every one would tell me the same thing, so I guess I got to the point where I was just disgusted. [ALJ]: They just told you to lose weight. Didn't they do any tests? [Campbell]: No, sir. They'd say to me, I'm sorry, they would give me urine tests, then they'd say nothing's wrong with your urine. [ALJ]: Didn't they listen to your heart? Didn't they use—[Campbell]: They listen at my heart, they say 'It's beating a little fast because your [sic] heavy.'").

11. Tr. 42 (ALJ: "[S]ee if you can get an opinion from Dr. Prewitt. Particularly, I don't think this is a condition that just comes

on over night, so ... he may have some opinion about how far back it goes.").

12. Tr. 150 (Letter from Dr. Prewitt to the ALJ).

13. Tr. 138–142, 145–148.

14. Tr. 150.

15. *Id.*

16. Tr. 21.

17. Tr. 20.

her difficulties." [18]

The ALJ found that Campbell had not engaged in substantial gainful activity since March 1, 1992, and that her obesity was a severe impairment prior to June 30, 1993.[19] However, the ALJ found that Campbell was not disabled because she had the "residual functional capacity" to perform her past work as an office manager, which requires only a sedentary level of exertion, and as a computer operator, which requires a light level of exertion.[20]

The appellate board denied review of the ALJ's decision.[21]

### B. The Recommended Ruling

Campbell instituted this action for judicial review, challenging the ALJ's assessment of her credibility and subjective complaints, his rejection of Dr. Prewitt's retrospective opinion, and his residual functional capacity assessment. The ALJ responded by arguing that the ALJ's denial of benefits was supported by substantial evidence on the record. The case was referred to Magistrate Judge Margolis, who recommended affirming the · decision of the ALJ.

In her recommended ruling, Magistrate Judge Margolis addressed the credibility assessment challenge by correctly noting that although the function of the ALJ includes evaluating the credibility of all witnesses, *Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir.1983), the ALJ must set forth his reasons behind his credibility assessments with specificity, *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 160–61 (2d Cir.1988) (internal citations omit-

ted), and the findings regarding credibility must be consistent with other evidence in the case. *Id.* at 261.[22] After reviewing the evidence, Magistrate Judge Margolis concluded that the ALJ's disbelief of Campbell's descriptions of her ailments was adequately supported by the fact that Campbell had produced too little medical evidence from the relevant time period to lay an objective foundation for her subjective complaints.[23]

Next, Magistrate Judge Margolis addressed the ALJ's rejection of Dr. Prewitt's retrospective opinion. She noted, as had the ALJ, that the Social Security Regulations require that greater weight be given to the opinion of a treating physician, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), and that the opinions of treating sources are controlling if they are "well supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).[24] She also recognized that in the Second Circuit, a treating physician's retrospective diagnosis and opinion are entitled to controlling weight unless they are contradicted by other medical evidence or "overwhelmingly compelling" non-medical evidence. *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir.1991); *Wagner v. Secretary of HHS*, 906 F.2d 856, 862 (2d Cir.1990).[25]

Addressing the ALJ's rejection of Dr. Prewitt's retrospective opinion, Magistrate Judge Margolis found two facts highly rel-

18. Tr. 19.

19. Tr. 21.

20. Tr. 21–22.

21. Tr. 7.

22. Recommended Ruling ("Rec.Rul.") at 15.

23. Rec.Rul. at 17.

24. Rec.Rul. at 17.

25. Rec.Rul. at 18.

evant: first, the letter from Campbell's attorney to Dr. Prewitt asking for his retrospective opinion contained a summary of the evidence presented by Campbell at the hearing, which she believed to be deficient in certain respects; and second, Magistrate Judge Margolis perceived an inconsistency between Dr. Prewitt's November 1995 letter to the ALJ, in which he described Campbell's 1995 impairments, and his retrospective opinion, where he described her impairments as he believed they existed in June 1993.[26] Based on these facts and the ALJ's rejection of Campbell's testimony, Magistrate Judge Margolis concluded that the ALJ was justified in rejecting Dr. Prewitt's retrospective opinion.[27]

Finally, Magistrate Judge Margolis addressed the residual functional capacity assessment, where the ALJ found that Campbell was capable of performing her past work as a computer operator and office manager prior to June 30, 1993. Magistrate Judge Margolis noted that Campbell bore the burden of proof on this issue, and because the ALJ found such insubstantiality in her testimony and Dr. Prewitt's opinion, Campbell had produced no competent evidence that she was not able to return to her former job. Thus, she concluded that the decision of the ALJ was supported by substantial evidence.[28]

Review of the recommended ruling is de novo, and the Court will focus principally on Campbell's challenges to the ALJ's decision as opposed to Campbell's objections to the Recommended Ruling. *Cf. Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (when Court of Appeals reviews district court's decisions regarding denials of benefits by the Commissioner, the court's focus "is not so much on the district court's ruling as it is on the administrative ruling") (internal quotations and citations omitted).

## II. Social Security Disability Determinations

An individual is entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. §§ 301 *et seq.,* if the individual is disabled within the meaning of the Act and was insured under the Act as of the date of disability.[29]

Once the ALJ has made a determination in a particular case, the function of the Court is to ascertain whether the correct legal principles were applied in making the determination and whether the determination is supported by substantial evidence.[30] *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). Absent legal error, the Court may not set aside the decision of the ALJ if it is supported by substantial evidence. *Id.* ("We set aside an ALJ's decision only where it is based on legal error or is not supported by substantial evidence."), *citing Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998) (internal quotations omitted). If the ALJ's findings are supported by substantial evidence and the correct legal principles were applied, the findings will

---

**26.** Rec.Rul. at 19–21.

**27.** Rec.Rul. at 21.

**28.** Rec.Rul. at 22.

**29.** In order to be considered disabled, the individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expect-

ed to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

**30.** Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rosa,* 168 F.3d at 77, quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996).

be sustained even where substantial evidence may support the claimant's position and despite the fact that the Court, had it heard the evidence de novo, might have found otherwise. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982).

### III. The ALJ's Decision and the Regulatory Framework

To determine whether Campbell was disabled on June 30, 1993, the ALJ addressed five questions in sequential order. 20 C.F.R. § 404.1520; *Rosa*, 168 F.3d at 77. First, he found that Campbell was not employed as of June 30, 1993. Second, he found that Campbell's obesity was a severe illness on June 30, 1993. Third, he found that Campbell's obesity did not meet or exceed any of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which the Commissioner acknowledges to be conclusively disabling. Fourth, he found that on June 30, 1993, Campbell's obesity did not limit her "residual functional capacity" to the point that she was no longer able to perform her former occupation as a computer operator or office manager. Because of the finding in the fourth step, the ALJ did not address whether Campbell was able to perform any other work in the national economy given her age, education, and work experience.

A critical part of the ALJ's determination was the third stage, in which he found that Campbell's severe illness (obesity) did not meet or exceed any of the specific impairments. Here, the ALJ specifically rejected Dr. Prewitt's retrospective opinion regarding the onset date of Campbell's congestive heart failure. Had the ALJ credited that opinion and found that Campbell's impairment met or exceeded the listed impairment of obesity (9.09), the ALJ would have been required to find Campbell disabled.

### A. Obesity, Congestive Heart Failure and the Listing

If a claimant is not working, as the ALJ found Campbell was not, and is suffering from a severe illness, as the ALJ found Campbell was, the claimant's illness must be compared with the "Listing of Impairments" found at 20 C.F.R. Part 404 Appendix One. If the claimant's impairment meets or exceeds one of the listed impairments, the claimant is automatically entitled to disability benefits. 20 C.F.R. § 404.1520(d) (if claimant is not working and suffers from an impairment on the list, claimant is automatically determined to be disabled); *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir.1984) ("if the claimant suffers from an impairment listed in 20 C.F.R. Part 404, subpart P, Appendix 1, that . . . ends the inquiry and the claimant is determined to be disabled").

Under the Listing as it existed in 1993 and 1995, Campbell's obesity would meet the Listing's specifications if her weight exceeded 266 pounds on or before June 30, 1993 and if she suffered from one of the listed conditions, which included a "[h]istory of congestive heart failure manifested by past evidence of vascular congestion such as hepatomegaly, peripheral or pulmonary edema." 20 C.F.R. Part 404, Appendix 1, 9.09 (Obesity).[31]

The ALJ concluded that it was reasonable to infer that her weight exceeded 266

---

**31.** "9.09 Obesity. Weight equal to or greater than the values specified in Table I for males, Table II for females (100 percent above desired level), and one of the following: A. History of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbosacral spine; or B. Hypertension with diastolic blood pressure persistently in excess of 100 mm. Hg measured with appropriate size cuff; or C. History of congestive heart failure manifested by past evidence of vascular con-

pounds,[32] but then stated: "However, there is no evidence (other than Dr. Prewitt's opinion, which will be discussed later) in the medical record of any of the complications necessary to meet the requirements of section 9.09 of the Listing of Impairments."[33]

Based on these regulations, if Campbell's impairment met or exceeded Listing 9.09 on or before June 30, 1993, the ALJ would have been required to grant her benefits when the ALJ heard her claim in 1995. Campbell's attorney made this point in his letter to Dr. Prewitt, where Attorney Weisman requested Dr. Prewitt's retrospective opinion, Weisman stated:

> I have enclosed a photocopy of the portion of the Social Security Regulations ("Cardiovascular" and "Obesity") which would provide a basis for finding Ms. Campbell disabled in 1993. At 5′ 5″ in height, her weight (as testified to at the hearing) of between 385–lbs. and 400–lbs. during her adult life, combined with evidence of the items referred to in Section 9.09 C & D [congestive heart failure and "chronic venous insufficiency"] would render her "disabled."[34]

### B. Congestive Heart Failure

The evidence on the record regarding congestive heart failure was: (1) the joint opinion of two consulting physicians who never examined Campbell, (2) Campbell's own testimony, and (3) the opinion of Dr. Prewitt, Campbell's treating physician in 1995.

The ALJ rejected the three-sentence opinion given by Drs. Zorman and Honeychurch, the state agency medical consultants who participated in the initial and reconsidered determinations. Those consultants expressed the opinion that Campbell had no severe impairment on or before June 30, 1993, based on the lack of medical records.[35] Despite the consultants' opinion that Campbell had not produced evidence sufficient to warrant a finding of a severe illness on or before June 30, 1993, the ALJ determined that the evidence supported a finding that Campbell's obesity was severe enough to limit her ability to work on or before June 30, 1993.[36] In explaining his rejection of the medical consultants' findings, the ALJ stated: "The State agency medical consultants did not have access to all of the medical evidence that is currently in the record and did not examine the claimant. There [sic] opinions are based as much on speculation as Dr. Prewitt's and are entitled to no more weight."[37]

Campbell also testified at the hearing to matters that are relevant to whether she

gestion such as hepatomegaly, peripheral or pulmonary edema; or D. Chronic venous insufficiency with superficial varicosities in a lower extremity with pain on weight bearing and persistent edema; or E. Respiratory disease with total forced vital capacity equal to or less than 2.0 L. or a level of hypoxemia at rest equal to or less than the values specified in Table III–A or III–B or III–C."

**32.** Tr. 18.

**33.** Tr. 18–19.

**34.** Tr. 152.

**35.** The opinions of Drs. Zorman and Honeychurch are found at Tr. 55. The full text is:

"DLI [date last insured] is 6/93. The only alleged source before 6/93 is a brief visit to Bridgeport Hospital in file dated 6/8/93 which showed enlarged tonsils treated with Amoxcillon. Otherwise there are no sources to contact before 6/93 DLI so claim must be denied due to insufficient information." There is no indication that either doctor did more than review the records in the file. The ALJ stated that neither doctor actually examined Campbell. Tr. 21.

**36.** Tr. 20–21.

**37.** Tr. 21.

suffered from congestive heart failure prior to June 30, 1993. Campbell did not describe her symptoms with a great deal of particularity: "In '93 called Dr. [Gulash] and I explained to him my symptoms. He said, 'It sounds ʹlike congestion.' I said, 'Well, can I make an appointment to come in?' He said, 'I'm going to prescribe something for you.' So he called the pharmacy and he prescribed the Gouletex. He said that'll help get the congestion of [sic] your chest and everything. He said, 'What's happening is your sinuses are draining down in your chest.' And I said, 'Well, it's like a heaviness on my heart.' " [38]

Campbell testified further that while "it eased up some" in the next few days, her condition then became worse for weeks and months.[39] She also described swelling and water retention, and indicated that every doctor she saw attributed her maladies to her excessive girth: "[T]hey'd say, 'Oh you're too heavy on your legs.... No one ever detected that it was congestive heart failure." [40]

The ALJ disbelieved Campbell's testimony regarding the severity of her ailments as they existed prior to June 30, 1993, because "[a] person with impairments as severe as those the claimant alleged, especially considering they allegedly prevented her from working, would be seeking medical attention and there would be contemporary medical records of her difficulties." [41]

With the independent medical consultants' opinion given no weight because they had not treated Campbell and did not have access to the complete file when they wrote their three-sentence report on November 7, 1995, and Campbell's testimony considered not entirely credible by the ALJ, the ALJ was left with only Dr. Prewitt's retrospective opinion that Campbell was suffering from congestive heart failure on or before June 30, 1993, as well as his medical records from 1995 forward, which reference the Bridgeport Hospital diagnosis of congestive heart failure in her March 1995 admission.

The ALJ, however, also rejected Dr. Prewitt's retrospective opinion: "The [ALJ] does not find Dr. Prewitt's opinion that the claimant had congestive heart failure and was disabled before June 30, 1993 to be controlling, or even to be entitled to much weight. Dr. Prewitt is presently the claimant's treating physician, but the treatment relationship did not begin before 1995. His conclusions about what her condition was before June 30, 1993 is [sic] not based on medical findings, but instead is [sic] based on the claimant's testimony, which the [ALJ] finds to be less than fully credible." [42]

Once the ALJ rejected Dr. Prewitt's retrospective opinion, there was simply no evidence left to conclude that Campbell had congestive heart failure on or before June 30, 1993. Because the burden was on Campbell to prove disability, the ALJ found that her obesity did not meet or exceed any of the conditions in the Listing, and proceeded with the analysis, ultimately denying Campbell's claim.

IV. Analysis of the Record

Campbell raises three principal objections to the ALJ's decision. First, she claims that he improperly rejected her testimony because it lacked an objective medical basis. Second, she claims that he

38. Tr. 36.

39. Tr. 36.

40. Tr. 35.

41. Tr. 19.

42. Tr. 20.

improperly rejected Dr. Prewitt's retrospective opinion. Third, she claims that he made an improper residual functional capacity assessment.

Prior to addressing Campbell's assignments of error, however, the Court must address a threshold issue regarding the applicability of the obesity listing.

### A. The Amended Listings

By the time Campbell initiated this action for judicial review of the Commissioner's final decision denying her disability insurance benefits, the impairment listing for obesity (20 C.F.R. Part 404, subpart P, app. 1, § 9.09) had been removed from the conclusive list of disabling impairments and replaced with more restrictive guidance regarding obesity. Under the revised guidelines, obesity is not a separate listed impairment; instead, the listing now contains guidelines about obesity in the prefaces of musculoskeletal, respiratory and cardiovascular body system listings. *See* Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria, 64 F.R. 46122, 46123 (August 24, 1999). The Social Security Administration explained in the regulations that § 9.09 was removed because "the criteria ... were not appropriate indicators of listing-level severity [in that] they did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." *Id.* at 46122.

This change in regulations was effective on October 25, 1999, two years after Campbell first instituted this action for judicial review. The regulation that initially deleted § 9.09 indicated that the removal would have only "prospective effect" and would not cause individuals already adjudicated disabled and receiving benefits to have their benefits terminated. *Id.* at 46126. Given this "prospective effect"

statement, at least one court concluded that claims pending at the judicial review stage that were filed prior to the removal of § 9.09 should be evaluated under the old criteria. *See Nash v. Apfel,* 215 F.3d 1337 (Table), 2000 WL 710491 (10th Cir. 2000) (unpublished).

Less than a month after the *Nash* decision, however, the Social Security Administration issued further guidance on the retroactivity issue:

> The final rules that deleted the listing became effective on October 25, 1999. The final rules deleting listing 9.09 apply to claims that were filed before October 25, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to court. The change affected the entire claim, including the period before October 25, 1999. This is our usual policy with respect to any change in our listings. However, different rules apply to individuals who were already found eligible to receive benefits prior to October 25, 1999.

65 F.R. 31039, 31041 (May 15, 2000).

Thus, it is the Social Security Administration's position that if Campbell's claim had been allowed by the ALJ in 1995, she would still be receiving benefits despite the subsequent removal. However, if at some stage of the review process either the agency or a court determines that her claim was wrongly denied in 1995, she is still nonetheless ineligible for any benefits because she was not actually *receiving* benefits until after the change, even though such a court determination would nonetheless mean that she *should have been* receiving benefits in 1995, but for the ALJ's error.

At least one court has found this position unacceptable. *Kokal v. Massanari,*

163 F.Supp.2d 1122, 1134 (N.D.Cal.2001) (concluding that SSA's "interpretation of its deletion of Listing 9.09 . . . is erroneous because it would result in impermissible [retroactivity] without Congressional authority" and ordering SSA to apply the old listing to plaintiff's claim on remand). *But see Fulbright v. Apfel,* 114 F.Supp.2d 465, 476 (W.D.N.C.2000) (deferring to SSA's position); *Wooten v. Apfel,* 108 F.Supp.2d 921, 924 (E.D.Tenn.2000) (same). Faced with conflicting authority on this matter, the court in *Portlock v. Apfel,* 150 F.Supp.2d 659 (D.Del.2001), remanded the case to the ALJ in part to determine whether 9.09 should be applied to plaintiff's claim.

For the reasons discussed below, a remand is necessary in any event. While the Court could consider the retroactivity issue and possibly have reached the same conclusion as the *Kokal* court, a remand with an order to apply Listing 9.09 (the disposition reached by the court in *Kokal*) is not prudent in this case. First, it is possible that after collecting further evidence on remand, the ALJ will conclude that Campbell's impairment met or exceeded another listing that is currently in effect. The SSA has issued new guidance for evaluating claims of disability that relate to obesity, *see* 65 F.R. 31039 (May 15, 2000), and the ALJ has never had the opportunity to apply this guidance to Campbell's case. Second, it is also possible that the additional evidence collected on remand will reveal that Campbell's impairment did not meet Listing 9.09 in any case. If either of these possibilities is in fact the case, a ruling by this Court on the issue of retroactivity would be entirely unnecessary to the disposition of Campbell's claim.

Even if the retroactivity issue does turn out to be dispositive (i.e., if the ALJ on remand determines that Campbell met Listing 9.09 but does not meet the revised criteria), this Court will benefit from the reasoned analysis of the SSA on the issue of retroactivity, which has not heretofore been addressed in Campbell's case. Finally, allowing the ALJ to address the issue first may even aid the SSA, inasmuch as the SSA will have the benefit of several court decisions analyzing the issue.

### B. Campbell's Assignments of Error

The ALJ determined that Campbell's impairment did not meet or exceed Listing 9.09 and that she had the Residual Functional Capacity to perform her previous jobs. If these determinations are correct, the retroactivity of the removal of Listing 9.09 is a non-issue. The Court concludes, however, that the proceedings below were flawed in several respects. A remand is thus necessary to further develop the record.

#### 1. The ALJ's Rejection of Campbell's Testimony

In his ruling, the ALJ explained that he did not credit Campbell's testimony about the severity her illness because "[a] person with impairments as severe as those the claimant alleged, especially considering they allegedly prevented her from working, would be seeking medical attention and there would be contemporary medical records of her difficulties." [43]

▮ In determining whether a claimant is disabled, the ALJ must consider "the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him," *Carroll v. Secretary of HHS,* 705 F.2d 638, 642 (2d Cir.1983) (listing factors Commissioner must consider when evaluating a social

---

**43.** Tr. 19.

security disability claim); *see also* 20 C.F.R. § 404.1512(b)(3) (evidence of an impairment includes "any … relevant statements you make to medical sources during the course of examination or treatment, or to us … in testimony in our administrative proceedings"). While "as a fact-finder, [the ALJ] is free to accept or reject" a claimant's subjective testimony, *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir.1988), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." Social Security Ruling 96–7p (June 7, 1996).

That is not to say that a claimant's subjective testimony by itself can establish disability. *See* 20 C.F.R. § 404.1529(a). "[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment … which could reasonably be expected to produce the pain or other symptoms alleged and which, *when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with medical signs and laboratory findings)*, would lead to a conclusion that you are disabled." *Id.* (emphasis added).

■ By eliminating Campbell's subjective testimony solely because it lacked objective medical support—and then eliminating Dr. Prewitt's objective medical support because it is based at least in part on the subjective testimony—the ALJ has created an irreducibly circular conundrum.

### 2. The ALJ's Rejection of Dr. Prewitt's Retrospective Opinion

The ALJ rejected Dr. Prewitt's medical opinion regarding Campbell's congestive heart failure because "the treatment relationship did not begin until 1995" and Dr. Prewitt's conclusion "about what [Campbell's] condition was before June 30, 1995 is not based on medical findings, but instead is based on the claimant's testimony, which the [ALJ] finds to be less than fully credible." [44]

■ While it is certainly true that "a treating physician's diagnosis of a patient's condition at a time in the past while the physician was not treating his patient is entitled to less weight than a treating physician's diagnosis of his patient's current condition while under active treatment or observation," *Arnone v. Secretary, Dept. of Health and Human Services*, No. 85 CV 1717, 1988 WL 76613 (E.D.N.Y. July 12, 1988), *aff'd sub nom on other grounds, Arnone v. Bowen*, 882 F.2d 34 (2d Cir. 1989), where "there is no medical testimony to rebut [the retrospective opinion of the treating physician], nor is there overwhelmingly compelling non-medical evidence to the contrary … in the absence of competing medical opinions[, then there is not] 'substantial evidence' necessary to support the Secretary's determination." *Rivera v. Sullivan*, 923 F.2d 964, 969 (2d Cir.1991), *quoting Wagner v. Secretary of HHS*, 906 F.2d 856, 862 (2d Cir.1990).

■ The retrospective opinion of a doctor who is currently treating a claimant is "entitled to significant weight," even though the doctor did not treat the claimant during the relevant period. *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir.1981). "A diagnosis of a claimant's condition may properly be made even several years after

---

44. Tr. 20.

the actual onset of the impairment. [S]uch a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to" the requisite onset date. *Id.* (internal quotations and citations omitted).

■ "A treating physician's opinion that an individual is disabled is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and if it is not inconsistent with other substantial evidence.... Even if the treating physician's opinion is retrospective, the opinion is binding on the ALJ unless contradicted by other medical evidence or overwhelmingly compelling nonmedical evidence." *Gercke v. Chater,* 907 F.Supp. 51, 52 (E.D.N.Y.1995), *citing* 20 C.F.R. § 404.1527(d)(2), *Rivera,* 923 F.2d at 968, and *Wagner,* 906 F.2d at 862.

■ In Campbell's case, less than three years elapsed between the alleged onset of Campbell's disability and the retrospective opinion of Dr. Prewitt. Further, Campbell did not forego seeking treatment: there is substantial evidence on the record that Campbell did, in fact, seek medical care, including records of hospitalizations in 1990, 1991, 1992 and 1995. While she lacked medical records to support her claim of visits and consultations with Dr. Gulash, Campbell did present evidence that circumstantially corroborates that she was at least under his care. First, Campbell introduced a hospital emergency room record from 1995, where she listed Dr. Gulash as her private physician.[45] Second, she introduced prescription bill bottles from November 1993 for "Penveek" pre-

scribed by Dr. Gulash and from November 1993 for "Guiatexla" prescribed by Dr. Gulash.[46] Even assuming (as the ALJ apparently decided) that Campbell never saw Dr. Gulash before June 30, 1993, the records show that she did not delay seeking treatment an inordinate amount of time, and was under Gulash's care from at the very least November 1993 until 1995.

As there are no competing medical opinions in the record,[47] the ALJ was required to give significant deference to Dr. Prewitt's opinion, and controlling weight if it was "predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment." *Dousewicz v. Harris,* 646 F.2d 771, 774 (2d Cir.1981) (internal quotations and citations omitted). The Second Circuit further elaborated on the *Dousewicz* standard in *Wagner,* 906 F.2d at 861, where the Secretary tried to defend the ALJ's rejection of a retrospective opinion by claiming that it did not meet the *Dousewicz* standard. The court rejected the Secretary's contention, noting that because the Secretary did not contest the claimant's current diagnosis, the Secretary had no reason to doubt the treating physician's retrospective diagnosis of the same condition:

> With regard to the requirement stated in *Dousewicz* of a clinically acceptable diagnostic technique, we believe that Dr. Naumann's diagnosis of hemiplegic migraine, adopted by the Secretary as the basis for post–1983 disability, is sufficient. The Secretary may be doubtful of the connection between Wagner's present condition and her pre–1983 symptomology, but, if so, he should have

---

**45.** Tr. 101.

**46.** Tr. 39.

**47.** With the exception of the properly discredited three sentence reports of Drs. Zorman and Honeychurch.

offered medical testimony specifically addressed to that nexus or lack thereof. Except for Dr. Blatchly's opinion, none of the medical evidence in the record confronts the question of whether the 1983 trauma explains the preceding three years' ailments.

*Id.*

Campbell's case falls into the same category. The ALJ never questioned Dr. Prewitt's opinion that Campbell was suffering from congestive heart failure in 1995, and no evidence was introduced that called into question the nexus between Campbell's condition in 1995 and her condition less than two years earlier.

The ALJ's rejection of Dr. Prewitt's retrospective opinion is attributable to the fact that Dr. Prewitt's letter to the ALJ is regrettably cryptic as to the basis of the opinion. Dr. Prewitt was asked to opine as her treating physician because of his knowledge of her medical condition from 1995 on, even though his letter seems to imply that his conclusion was based only on the summary of Campbell's testimony at the hearing. In fact, however, this letter responded to the July 3, 1996 letter requesting his opinion "based on her present condition and this history."[48] Thus, there is no basis for concluding that Dr. Prewitt's response did not include his medical assessment of the nature and severity of Campbell's condition from 1995 to present.[49]

The conclusion that Dr. Prewitt's retrospective opinion was based solely on a summary of Campbell's testimony is also belied by the medical records supplied by Dr. Prewitt with his November 1995 letter. Dr. Prewitt clearly had a significant treating relationship with Campbell: the record contains twenty-two dated entries spanning from June 3, 1995 to May 13, 1996.[50] Along with his office notes, Dr. Prewitt's November 1995 letter to the ALJ describes Campbell's physical limitations as "profound" and noted that she was under his care for oxygen-dependent emphysema, sleep apnea morbid obesity and congestive heart failure.[51] While the 1995 letter and the office notes describe Campbell's current maladies and do not purport to describe her condition in 1993, they are highly significant because they establish Dr. Prewitt's familiarity with Campbell's condition and thus make his subsequent retrospective opinion more credible.

The ALJ did not consider that because Campbell was under Dr. Prewitt's care in 1995 for these ailments, Dr. Prewitt was in a far superior position than was the ALJ to make a retrospective opinion as to the state of Campbell's health in 1993. While such an opinion will necessarily lack the exactitude of a contemporaneous diagnosis from the treating physician, it is certainly entitled to deference in the absence of contradictory evidence.

■ Further, even if the ALJ properly discredited Dr. Prewitt's opinion based on

---

**48.** Tr. 151.

**49.** This more natural reading is further buttressed by the fact that Dr. Prewitt's office notes either accompanied his retrospective opinion or followed immediately thereafter, circumstantially rebutting the notion that his opinion was devoid of support from his treating relationship with Campbell: Dr. Prewitt's retrospective opinion was written *after* the hearing was conducted, and the first half of his notes (up to the date of the hearing) were

introduced as evidence at the hearing, *see* Tr. 145 (Dr. Prewitt's office notes through November 13, 1995 are stamped "Exhibit 23; 4 pages; Rec'd at Hearing"), while his notes covering the period after the hearing are immediately before Dr. Prewitt's retrospective opinion in the certified administrative record.

**50.** Tr. 138–142, 145–148.

**51.** Tr. 137.

the ALJ's disbelief of Campbell's testimony, the ALJ would still not be warranted in rejecting the opinion altogether. The ALJ "cannot reject the treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) (citations omitted). "A corollary to the [treating physician rule is] that the decision maker [has] a duty to seek clarification from a treating physician in the event the physician's report [is] somehow incomplete." *Geracitano v. Callahan*, 979 F.Supp. 952, 956 (W.D.N.Y.1997), *citing Schisler v. Bowen*, 851 F.2d 43, 46–47 (2d Cir.1988). "Social Security Regulations place an affirmative duty on decision makers to seek clarification or elaboration from medical sources." *Geracitano*, 979 F.Supp. at 957, *citing* 20 C.F.R. § 404.1512(e)(1) ("We will seek evidence or clarification from your medical source when the report from your medical source ... does not contain all the necessary information").

Here, the ALJ rejected Dr. Prewitt's diagnosis without clarifying the extent to which that diagnosis was based on Dr. Prewitt's medical analysis based on his treatment of Campbell, which began in 1995. At the very least, the Court concludes that the ALJ was obligated to seek clarification from Dr. Prewitt as to the basis of Dr. Prewitt's opinion.

### 3. Residual Functional Capacity Assessment

The ALJ concluded that Campbell retained the ability to perform her past work as an office supervisor and as a computer operator. While such a conclusion may have been warranted on the scant evidence in the record, given the Court's conclusion that the ALJ improperly rejected Campbell's subjective testimony, improperly disregarded the retrospective opinion of Campbell's treating physician, and failed to fill clear gaps in the administrative record, this conclusion will have to be reexamined on remand.

Further, on remand the ALJ will have the benefit of SSA's new guidance on the evaluation of obesity. *See* 65 F.R. 31039 (May 15, 2000). Specifically, the new guidelines specifically address the evaluation of obesity when assessing Residual Functional Capacity:

Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected. The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning. An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. [O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fa-

tigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea. The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

65 F.R. 31039, 31041–31042 (footnote omitted).

### V. Disposition

Because the ALJ improperly discounted Campbell's subjective reports of her ailments and failed to either give sufficient deference to Dr. Prewitt's retrospective opinion or, in the alternative, failed to sufficiently clarify the basis of that opinion, the Commissioner's denial of benefits on this record must be reversed.

There are instances when a remand for the purpose of more fully developing the administrative record is appropriate. In *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.1999), the Second Circuit reversed the decision of the ALJ and remanded for a fuller development of the record. "[I]t is appropriate for [the court] to exercise its power ... to remand the cause for a rehearing [when] the primary problem with the decision below is that the ALJ failed to adequately develop the record before her." *Id.* at 83 n. 8 (internal quotations and citations omitted). In remanding, the court noted that "further findings would so plainly help to assure the proper disposition" of the claim, because "the ALJ failed to develop the record sufficiently to make any appropriate determination in either direction." *Id.* at 83 (internal citations and quotations omitted).

Similarly, in *Williams v. Apfel*, 204 F.3d 48 (2d Cir.1999), the Second Circuit re-

versed the district court's award of benefits, and held instead that the case should have been remanded to the ALJ to continue with the five-step sequential analysis. *Id.* at 50. While the court upheld the district court's determination that there was not substantial evidence on the record from which the ALJ could have concluded that the claimant was able to perform her past clerical work, *id.*, a remand to the ALJ was necessary because the district court found that the ALJ erred at step four in the analysis, and under the regulations, there was a step remaining to be taken in the five-step sequential analysis. 20 C.F.R. § 404.1520 ("If you cannot do any work you have done in the past because you have a severe [impairment], we will consider your residual functional capacity [calculated at step four] and your age, education and past work experience to see if you can do other work.").

A remand for the purpose of gathering additional evidence is appropriate in this case for several reasons. First, Dr. Prewitt's opinion contains the phrase "given Ms. Campbell's testimony per your letter" immediately prior to his retrospective diagnosis. A remand in this case will allow the assigned ALJ to obtain clarification of the basis for Dr. Prewitt's retrospective opinion. Second, there have been significant changes in the SSA regulations regarding impairments related to or resulting from obesity. Not only has the listing under which the ALJ evaluated Campbell's illness been removed, but the SSA has revised other potentially relevant listings relating to cardiovascular health in order to take account of the pervasive effects of severe obesity. Finally, SSA has issued new guidance on the evaluation of obesity claims in general. This guidance explains how ALJs are to factor obesity into their evaluation of Residual Functional Capacity. The guidance in this regard is highly applicable to Campbell's claim, given its extensive discussion of the collateral ef-

fects of obesity, including sleep apnea and impairment of exertional abilities.

In order to facilitate any further judicial review that may be sought after the ALJ reaches a decision on remand, the Court directs the ALJ to make the following specific factual findings. First, the assigned ALJ should clarify the basis of Dr. Prewitt's retrospective opinion and take any further evidence bearing on Campbell's eligibility for benefits as of June 30, 1993. At step three of the sequential analysis, the ALJ should make specific factual findings *both* on whether Campbell's impairment (as it existed on June 30, 1993) meets or exceeds the listing for obesity (9.09) as that listing existed prior to its removal as well as whether the impairment meets or exceeds any of the revised listings, and thereafter set out which listing the ALJ applies. If the ALJ reaches the RFC assessment, the new SSA guidance on evaluating obesity in the context of that assessment must be applied.

VI. Conclusion

For the reasons set forth above, Campbell's Motion for an Order Reversing the Decision of the Commissioner, or in the alternative, Remand[ing] for a New Hearing [Doc. # 22] is GRANTED IN PART AND DENIED IN PART, as outlined above. The Commissioner's decision denying benefits is REVERSED and the case is REMANDED to the Commissioner for further proceedings consistent with this opinion and order. The Defendant's motions to affirm the final decision of the Commissioner [Doc. # 25 and # 27] are DENIED, and the defendant's motion to dismiss for failure to prosecute [Doc. # 27] is DENIED AS MOOT.

IT IS SO ORDERED.