Carmen A. MARTINEZ, Plaintiff,

v.

Larry G. MASSANARI, Acting
Commissioner of Social
Security, Defendant.

No. 01 Civ. 2114(VM).

United States District Court,
S.D. New York.

Jan. 27, 2003.

Charles E. Binder, Binser and Binder, New York City, for Plaintiff.

Susan D. Baird, United States Attorney, Southern District of New York, New York City, for Defendant.

## *DECISION AND ORDER*

MARRERO, District Judge.

Plaintiff Carmen A. Martinez ("Martinez") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g), seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her Application for Disability Insurance Benefits dated December 3, 1997 (the "Application") filed pursuant to Titles II and XVIII of the Act, 42 U.S.C. §§ 401 *et seq.* and 1395 *et seq.* Martinez alleges errors entitling her to a new administrative hearing. The Commissioner disagrees. Martinez and the Commissioner have filed a motion and cross-motion, respectively, for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed blow, Martinez's motion is GRANTED and the Commissioner's motion is DENIED.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Martinez filed her Application for disability benefits with the Social Security Administration (the "SSA") on December 3, 1997. Her Application was denied, and she requested a hearing which was conducted before Administrative Law Judge Allan T. O'Sullivan (the "ALJ") on April 20, 1999 and at which Martinez was represented by counsel. The ALJ issued a decision on June 19, 1999 (the "SSA Decision") finding that Martinez was not disabled during the relevant time period and denying her claim for disability benefits. Martinez sought administrative review from the SSA's Appeals Council, and the SSA Decision became final when the Appeals Council denied her requested review on January 26, 2000.

### B. MEDICAL EVIDENCE AND MARTINEZ'S PERSONAL BACKGROUND

#### 1. Martinez's Personal History

Martinez was born on March 6, 1943.[1] She attended high school into the twelfth grade but did not graduate, though she testified at the administrative hearing that she could read and write English. She worked as a secretary for a hospital blood bank from 1969 through 1981. From November 1984 through January 1985, Martinez worked part-time as a receptionist and operator at a nursing home. Martinez was medically insured through March 31, 1987.

#### 2. Medical Evidence Prior To March 31, 1987

Prior to 1981, Martinez experienced pain in her lower back radiating down her right leg. In 1981, she had surgery to remove a herniated disc in her back. She testified to considerable pain and limited mobility following this surgery through March 31, 1987 and beyond.

Medical records from Martinez's 1981 surgery and followup treatment at the Hospital for Joint Disease are unavailable, but Martinez supplied copies of her relevant payment records. (R. at 166–76.) Payment records, bills, and related forms, while not especially detailed, also indicate that Martinez was admitted to the Hospital for Special Surgery in New York, New York for four days in March 1982, (R. at 160–178, 181–83), to New York Hospital in New York, New York for nine days in October–November of 1982, (R. at 184–85), and to Doctor's Hospital in January 1985, where she was diagnosed with sciatic radiculopathy and cervical radiculitus, (R. at 159–160).

#### 3. Medical Evidence After March 31, 1987

##### a. Diagnoses, Performance Evaluations, and Treatment

Martinez had been treated by Dr. Edgar Baraya from August 1988, seventeen months after her date last insured, through and beyond the date of the SSA Decision. Martinez visited Dr. Baraya twice each month for radiating neck and lower back pain. In a report of Martinez's condition dated December 15, 1997, Dr. Baraya explained that Martinez underwent a laminectomy of a herniated disc in 1981

---

1. The Court's recitation of relevant facts is derived from the transcript of the administrative record filed by the Commissioner as part of his answer in accordance with § 205(g) of the Act, 42 U.S.C. § 405(g), which is referred to hereinafter as "R." Additional citations appear as necessary.

but that the operation worsened her pain to the point of preventing her from working in light of the subsequent restricted mobility. He diagnosed her with chronic lumbar pain, a herniated disc at L4–5, and cervical discogenic disc disease at SC–6. (R. at 109.–116.) Dr. Baraya explained that Martinez's mobility was restricted as follows: she could lift and carry weights of up to five pounds for no more that two hours per day; she could stand or walk for less than two hours per day; she could sit for less that six hours per day; and she experienced restrictive pain with any amount of pushing or pulling. (R. at 113.) Dr. Baraya reiterated these same conclusions in a report dated August 21, 1998, (R. at 122–26), and again in a reports dated April 9, 1999 and April 17, 1999, (R. at 188–93, 194). Martinez was also evaluated by Dr. Howard Finelli, to whom she was referred by Dr. Baraya in December 1988. Dr. Finelli diagnosed Martinez at that time as status post laminectomy, referencing her 1981 surgery, with ruled out disc herniation and impingement. (R. at 121.)

Martinez submitted additional assessment reports and related evidence to the Appeals Council, (R. at 204–243), which this Court treats as part of the administrative record. *See Brown v. Apfel,* 174 F.3d 59, 62 (2nd Cir.1999) ("In reviewing an ALJ's decision, we consider the entire administrative record, including new evidence submitted to the Appeals Council."); *Perez v. Chater,* 77 F.3d 41, 46 (2nd Cir. 1996). This evidence included, among other things, various treatment notes of Martinez's visits with Dr. Baraya, (R. at 207–231), as well as the results of an evaluation by Dr. Cyrus Vosough, whose report dated April 28, 1999 indicates similar findings and conclusions as well as diagnoses of cervical derangement and radiculopathy, lumbrosacral derangement and radiculopathy, and myofascial pain syndrome, (R. at 241–43).

On February 24, 1998, the SSA referred Martinez to a consulting physician, Dr. W.H. Wells, for evaluation, and Dr. Wells, in the course of answering a dozen multiple choice questions on an SSA form, indicated that Martinez could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk six hours in an eight hour work day, and push and pull without restriction. (R. at 144–51.) On April 13, 1998, Martinez was referred to another SSA consultant, Dr. Michael Polack, for evaluation. Dr. Polack examined Martinez and reported that she "should have no difficulty doing activities [that] require dexterity, walking or standing. She has a mild difficulty doing activities which require carrying/lifting, pushing/pulling, bending and sitting." (R. at 137–38.) Dr. Polack did not have the benefit of Martinez's prior medical records or examination results, other than an April 1998 x-ray, when he conducted his assessment.

b. *Diagnostic Testing Results*

In February 1989, Martinez underwent an MRI examination of her lumbar spine, the results of which were presented in a report to the SSA dated February 2, 1989. (R. at 120.) This report indicates that the MRI revealed "mild to moderate" disc degeneration and bulging at L4–5. In January 1990, Martinez underwent a cervical spine MRI, the results of which were conveyed in a report dated January 11, 1990. (R. at 117.) This report indicates the results in part as follows: "C5–C6 posterior disc protrusion with dural sac disc space impingement. Loss of the normal cervical lordosis seen with muscle spasm." A nerve conduction study of the cervical spine was performed on December 24, 1992, which indicated "partial denervation of C6, C7 ... indicating cervical radiculopathy...." (R. at 131–32.) On April 9, 1996, Martinez underwent additional MRI

examinations of her lumbar spine, which indicated

> lost of normal disc signal and disc space height consistent with disc degeneration. Anterior hypertrophic changes and disc bulging is identified at this level. A central focal disc bulge is noted.... Loss of disc signal consistent with desiccation is identified at L3–4 and partial loss of disc signal consistent with partial desiccation is identified at L5–S1.

(R. at 133.) The results of various x-ray tests and their indications, which include "narrowing of multiple disc spaces" and "arthritic changes with disc narrowing," are reported by Dr. Peter Godsick in notes from April through July 1996. (R. at 133–34.) A more detailed report of an x-ray examination dated December 24, 1996 indicates "narrowing of the L4–L5 intervertebral disc space. Anterior degenerative spur formation at the L4 and L5 levels, adjacent to this narrowed disc space. A localized area of sclerosis and a small lucence is seen...." (R. at 135.)

Additional diagnostic testing results were submitted to the Appeals Council. On May 18, 1998, Martinez underwent MRI scans of her lumbar and cervical spine. The lumbar examination revealed "a suggestion of a left laminotomy defect at the inferior articular facet of L4." (R. at 234.) The cervical examination indicated "spondylosis with mild extradural mass effect at the C5–6 level anteriorly." (R. at 234–35.) Finally, x-rays of the lumbrosacral spine conducted in April 1998 indicate as follows: "Osteopenia. Mild narrowing at L4–L5 with mild scoliosis with convexity to the left." Contemporaneous cervical spine x-rays indicate "a mild disc space narrowing at C5–C6 and posteriorly at C6–C7 by osteophytes. There are small anterior osteophytes at C6–C7.... Loss of lordosis with degenerative changes...." (R. at 142–43.)

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

■ This Court reviews the findings and decision of the ALJ under the "substantial evidence" standard. *See* 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (citation omitted). If the court finds that there is substantial evidence to support the Commissioner's decision, that decision must be upheld, even if there also is substantial evidence for the plaintiff's position. *See DeChirico v. Callahan,* 134 F.3d 1177, 1182 (2nd Cir.1998); *Alston v. Sullivan,* 904 F.2d 122, 126 (2nd Cir.1990).

The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A). Furthermore, the Act requires that a claimant be insured for disability insurance benefits during the onset of the disability. *See* 42 U.S.C. § 423(a)(1)(A); *see also* 20 C.F.R. § 404.130; 20 C.F.R. § 404.315(a).

In evaluating a claim of disability, the ALJ proceeds according to a five-step process. The ALJ begins by determining whether the claimant is engaged in substantial gainful activity. If not, at step two, the ALJ asks whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to perform basic work activities. If the ALJ finds a "severe impairment" that is listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P, there is a presumption of disability. If the "severe impairment" is not

contained in Appendix 1, the ALJ must determine whether the claimant has the residual functional capacity to perform past work. Finally, at step five, if the claimant is unable to perform past work, the ALJ determines whether there is other work that he is capable of performing. The claimant has the burden of proving the requirements of the first four steps and, if satisfied, the burden shifts to the Commissioner at step five. *See Perez,* 77 F.3d at 46.

A treating source's opinion about the nature and severity of a medical condition must be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record...." 20 C.F.R. § 404.1527(d)(2). When a treating source's opinion is not given controlling weight, its probative value must be determined by considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and depth of the treatment relationship; (3) the degree of support, particularly in the form of medical records and tests, for the treating source's opinion; (4) consistency with the record as a whole; (5) whether the treating source is a specialist in the area of treatment; (6) other factors relevant to the determination. *See* 20 C.F.R. § 404.1527(d)(2) through (d)(6); *see, e.g., Shaw v. Chater,* 221 F.3d 126, 134 (2nd Cir.2000); *Clark v. Comm'r of Soc. Security,* 143 F.3d 115, 118 (2nd Cir.1998). "The regulations also require the ALJ to set forth her reasons for the weight she assigns to the treating physician's opinion." *Shaw,* 221 F.3d at 134; *Clark,* 143 F.3d at 118.

When the information received by the SSA is inadequate to determine if the claimant is disabled, the SSA must attempt to re-contact the claimant's medical sources and, if necessary, arrange for consultive examinations with other medical sources, for clarification or supplementation. *See* 20 C.F.R. § 404.1512(e)(1) (The SSA "will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.") and 20 C.F.R. § 404.1512(f) ("If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."). As the Second Circuit has explained, "[t]he ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel...." *Perez,* 77 F.3d at 47; *see also Schaal v. Apfel,* 134 F.3d 496, 505 (2nd Cir.1998) ("[I]f the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte.*").

## B. RETROSPECTIVE DIAGNOSES AND THE PROBITY OF THE TREATING SOURCE'S OPINION

Because Martinez was last insured for Title II purposes on March 31, 1987, she must establish that her disability commenced on or before that date. *See* 42 U.S.C. §§ 423(a)(1)(A) and (D). The ALJ found that Martinez did not meet this burden, in the process rejecting the opinion of Martinez's treating physician, Dr. Baraya. The ALJ noted Dr. Baraya's finding that Martinez "has a history of lumbar pain dating to 1981[and] has continued to have back pain." (R. at 17.) He also noted Dr. Baraya's opinion that "the claimant is able to sit two hours and stand/walk three

hours in an 8-hour workday and in [sic] unable to lift or carry any weights.... Dr. Baraya stated that the claimant has a cervical spine herniated disc and a lumbar herniated disc and is disabled." (R. at 17.) The ALJ concluded, however, that "there are no supporting clinical or diagnostic findings concerning Dr. Baraya's assessment of the claimant's residual capacity, which must therefore be discounted.... Following the claimant's brief hospitalization in January 1985, there are no *contemporaneous* medical records of treatment through the date that the claimant was last insured." (R. at 19; emphasis added.)

The ALJ discounted the opinion of Martinez's treating physician as unsupported by any contemporaneous clinical or diagnostic findings. (R. at 19.) The record does contain some albeit general evidence of treatment prior to March 31, 1987, including billing and related records indicating back surgery and followup treatment in 1981, as well as subsequent hospital admissions in March 1982, October–November 1982, and January 1985. More significantly, the record contains evidence of not only bimonthly treatment but testing since that date, including an MRI examination of Martinez's lumbar spine in February 1989, a cervical spine MRI examination in January 1990, a nerve conduction study of the cervical spine performed in December 1992, additional lumbar spine MRI examinations in April 1996, various x-ray tests from April through July and in December 1996, and an x-ray scan of Martinez's lumbrosacral spine conducted in April 1998. Also, an additional MRI examination of her lumbar and cervical spine was performed in May 1998, the results of which were submitted to the Appeals Council. The ALJ's decision to discount Dr. Baraya's opinion rests specifically on the absence of supporting "clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1527(d)(2), that were "contemporaneous" with the relevant time period, in other words, conducted prior to March 31, 1987. (R. at 19.) Absent from the ALJ's analysis, however, is a discussion of retrospective diagnosis.

 It is well-settled that the "treating physician rule" applies to retrospective diagnoses, those relating to some prior time period during which the diagnosing physician may or may not have been a treating source, as well as to contemporaneous ones. *See Shaw,* 221 F.3d at 133; *Perez,* 77 F.3d at 48; *Wagner v. Secy. of Health and Human Serv.,* 906 F.2d 856, 861–62 (2nd Cir.1990). This means that a retrospective diagnosis by a treating physician is entitled to controlling weight unless it is contradicted by other medical evidence or "overwhelmingly compelling" non-medical evidence. *See Rivera v. Sullivan,* 923 F.2d 964, 968–69 (2nd Cir.1991). The retrospective opinion of a doctor who is currently treating a claimant is "entitled to significant weight" even though the doctor did not treat the claimant during the relevant period. *Campbell v. Barnhart,* 178 F.Supp.2d 123, 134–35 (D.Conn.2001) (quoting *Dousewicz v. Harris,* 646 F.2d 771, 774 (2nd Cir.1981)). The Second Circuit has explained that

[a] diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment. Such a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of a physical impairment prior to [the relevant time.]

*Dousewicz,* 646 F.2d at 774. "Indeed, claimants have won reversal of adverse decisions by the [SSA] even where their condition is degenerative, making retrospective evaluation of their ability to work somewhat speculative, and even where some non-physician testimony or evidence suggests a possible ability to work at the

relevant time." *Rivera*, 923 F.2d at 968 (citing *Wagner*, 906 F.2d at 861).

It is true that Martinez was treated and diagnosed by Dr. Baraya after she became uninsured, but his conclusions regarding pain explicitly extend back to her 1981 back surgery, well into the insured period. What remains unclear, however, is whether Dr. Baraya's diagnoses based on evaluations conducted after the date last insured also relate back into the insured period and account for Martinez's condition at that time, or, whether Martinez's condition was too amenable to change and aggravation to enable Dr. Baraya to form this conclusion reasonably. The Second Circuit has explained that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record" and that "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel...." *Rosa v. Callahan*, 168 F.3d 72, 79 (2nd Cir.1999); *see* 20 C.F.R. § 404.1512(e)(1); *Schaal*, 134 F.3d at 505; *Perez*, 77 F.3d at 47.

■ The ALJ's failure to pursue and consider the possibility of retrospective diagnosis based on these subsequent tests and treatments was error. The ALJ was not bound to accept as sufficiently supported Dr. Baraya's diagnoses as retrospectively applicable in light of the other evidence of pain and treatment in the record during the insured period. However, that three physicians who evaluated Martinez, including Dr. Baraya, her treating source, acknowledged a continuity of back problems commencing well before the date last insured obligated the ALJ to explore the possibility that the diagnoses applied retrospectively to the insured period. The ALJ, instead, ignored or overlooked the possibility of retrospective diagnosis and testing, concentrating instead on the absence of contemporaneous diagnosis and testing during the insured period as grounds to discount Dr. Baraya's opinion.[2] To the extent that the evidence submitted was insufficient for the ALJ to form a conclusion regarding the reliability of the assessments Dr. Baraya performed as sufficient bases to support an inference of retrospectiveness in his diagnoses, he was obligated to supplement the record with clarifying evidence. *See* 20 C.F.R. §§ 404.1512(e)(1) and (f); *Perez*, 77 F.3d at 47; *Schaal*, 134 F.3d at 505. Additional evidence should have addressed such matters as the reliability of the diagnostic tests and techniques conducted after the date last insured as indicators of some enduring, preexisting, or even progressive condition, the permanent or variable nature of Martinez's diagnoses and ailments, and, perhaps, any potential intervening aggravating factors possibly accounting for some worsening of her condition. The ALJ pursued none of these questions and left a gap in the record regarding retrospectiveness.[3]

---

2. The Court notes that Dr. Vosough's report and the May 18, 1998 MRI examination results were submitted to the Appeals Council following the SSA Decision and that, therefore, the ALJ did not have occasion to review them before rendering the SSA Decision. Nonetheless, various other medical assessments and diagnostic testing results were in evidence before him during the administrative hearing as indicated in Section I.B.3 *supra*. Therefore, the Court's conclusion that the ALJ's failure to explore the possibility of retrospective diagnosis constitutes error does not depend on this additional evidence submitted to the Appeals Council. Furthermore, because this evidence is to be considered part of the administrative record, *see Brown*, 174 F.3d at 62; *Perez*, 77 F.3d at 46, it provides additional support for a finding of error because the Commissioner, through the Appeals Council, still chose not to pursue the matter.

3. The Commissioner argues that substantial evidence exists in the record to support the SSA Decision, which must therefore be af-

The Commissioner argues that the presence of inconsistent evidence in the record, namely, the evaluation and opinion submitted by Dr. Polack and by Dr. Wells, constitutes a basis not to accord Dr. Baraya's opinion controlling weight as Martinez's treating source. (*See* Memorandum Of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support Of The Commissioner's Cross–Motion For Judgment On The Pleadings dated March 4, 2002 ("D.Br."), at 12.) Initially, the Court recognizes a certain general consistency among the documented evaluations and conclusions offered by Dr. Baraya, Dr. Finelli, and Dr. Vosough.[4] Nonetheless, the Court need not address the Commissioner's argument that the opinion of Dr. Baraya, Martinez's treating source, was properly denied controlling weight for being inconsistent with that of Dr. Polack and Dr. Wells because that argument highlights a second defect in the SSA Decision: the ALJ failed to articulate and, it appears, engage in the credibility analysis dictated by 20 C.F.R. § 404.1527(d)(2) through (d)(6) and, instead, summarily discounted Dr. Baraya's opinion. (R. at 19.) The ALJ's failure to properly assess the probity of Dr. Baraya's opinion, once determining, albeit improperly for the reasons stated above, that this opinion was not controlling, independently constitutes error. *See* 20 C.F.R. §§ 404.1527(d)(2) through (d)(6); *Shaw,* 221 F.3d at 134; *Clark,* 143 F.3d at 118.

## C. *MARTINEZ'S CREDIBILITY*

Martinez also argues that the ALJ's analysis of her credibility was improper insofar as the bases upon which he determined that her "testimony about her symptoms and limitations was not credible," (R. at 19), were not set forth adequately in the SSA Decision. In asserting this claim, Martinez points out the existence of corroboration in the form of the billing records reflecting hospitalizations in the years following her 1981 surgery as well as the diagnostic testing and the reports from Dr. Baraya following the date she was last insured. (Memorandum Of Law In Support Of Plaintiff's Motion For Judgment On The Pleading, dated Feb. 1, 2002, at 18.) The Commissioner argues that Martinez's credibility was set forth as best as possible given what he asserts to be "very little objective medical evidence, or other evidence," in the record. (D. Br. at 12–13.)

> This Court has previously explained that the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged. However, if the ALJ decides to reject subjective testimony concerning pain and other symptoms, she must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether [her] determination is supported by substantial evidence.

*Lugo v. Apfel,* 20 F.Supp.2d 662, 663 (S.D.N.Y.1998) (citations omitted) (internal quotations omitted). In this case, determining Martinez's credibility necessarily depends in large part on the extent to which her subjective claims of impairment

firmed. (*See* Memorandum Of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support Of The Commissioner's Cross–Motion For Judgment On The Pleadings dated March 4, 2002, at 9–11.) The Court cannot properly evaluate whether the SSA Decision is supported by substantial evidence in the record, however, because the record itself is deficient insofar as it does not clearly address the matter of retrospective diagnosis.

4. Dr. Vosough's conclusions were submitted to the Appeals Council.

are corroborated by medical evidence. The ALJ's assessment of the medical evidence was incomplete for the reasons set forth in Section II.B *supra*. Therefore, a definitive finding concerning the ALJ's credibility analysis is not only unnecessary, as the Court has already found error warranting a remand, but it also would serve no purpose on remand because the facts upon which Martinez's credibility would be assessed would have fundamentally changed insofar as the new hearing would address the issue of retrospective diagnoses, which the original hearing overlooked. Accordingly, while the Court does recognize a certain conclusory element to the ALJ's analysis of Martinez's credibility, the Court sees no reason to offer further comment.

### III. *CONCLUSION AND ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that Martinez's motion for judgment on the pleadings is DENIED to the extent she seeks reversal of the Commissioner's decision, but GRANTED to the extent she seeks a remand to the Commissioner for a new hearing; and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings is DENIED; and it is further

**ORDERED** that this case is remanded to the Commissioner of Social Security for further administrative proceedings consistent with this Decision and Order.

This remand is ordered pursuant to sentence four of 42 U.S.C. § 405(g). *See Morillo v. Apfel*, 150 F.Supp.2d 540, 548 (S.D.N.Y.2001); *Nivar v. Apfel*, No. 98 Civ. 3390, 1999 WL 163397, at *5 (S.D.N.Y. March 23, 1999). The Court retains jurisdiction over this case for the enforcement of this Order and any future proceedings with respect to this application.

The Clerk of Court is directed to close this case.

**SO ORDERED.**