**Christopher KLETT, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security Defendant.**

**No. 01 CIV. 10879(VM).**

United States District Court,
S.D. New York.

Feb. 19, 2004.

Elyse J. Factor, Westchester/Putnam Legal Services, Inc., Yonkers, NY, for plaintiff.

Susan D. Baird, New York, NY, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Christopher Klett ("Klett") brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Children's Insurance Benefits under Title II of the Act. Klett argues that he presented substantial evidence of his disability during a hearing on his claim before an administrative law judge (the "ALJ"). Klett alleges that the ALJ erred by ascribing insufficient weight to this evidence, and that therefore the Commissioner's decision to adopt the ALJ's ruling denying Klett's claim was erroneous. The parties have filed cross-motions for judgment on the pleadings. For the reasons stated below, Klett's motion is denied and the Commissioner's cross-motion is granted.

## I. ADMINISTRATIVE PROCEEDINGS

Klett filed an application for Disabled Child's Insurance Benefits in 1998 as the disabled child of a retired wage earner. Klett claimed that he was disabled as of August 1, 1985, when he was 21 years old. After his application was denied initially and upon reconsideration, Klett requested a hearing before an Administrative Law Judge. The ALJ conducted a hearing on February 9, 2000, and subsequently issued

a decision denying Klett's application. The ALJ's decision became the final decision of the Commissioner on September 28, 2001, when the Appeals Council of the Social Security Administration denied Klett's request for review.

## II.  BACKGROUND

Klett argues that he is entitled to recover Child's Insurance Benefits pursuant to 42 U.S.C. § 402(d) because he became disabled before reaching age 22 and is the child of an individual entitled to old-age benefits. Klett asserts that he became disabled as of August 1, 1985, thirty-eight days before his twenty-second birthday on September 8, 1985.

Klett suffers from Tourette's Syndrome[1] and chronic depression. He has been receiving Supplemental Security Income benefits based on this disability since June 24, 1993.

### A.  PERSONAL HISTORY

Klett graduated high school in 1981 after completing a college preparatory program. He attended Wesleyan University in Middletown, Connecticut and graduated in 1985 with a B plus grade point average. Klett spent the spring semester of his junior year of college in 1984 studying in England.

During his first year of college, he worked for one semester at the circulation desk of the college library. For six weeks during the summer after his first year of college and for three weeks after his second year he assisted a salesman stocking grocery store shelves. At the hearing before the ALJ, Klett indicated that he had difficulty performing his summer jobs because he repeatedly became lost while driving to different stores and frequently became anxious and frustrated. For two months in the summer of 1993 Klett worked as a county park monitor but left due to anxiety and fear over confrontations. Klett began working as a library clerk in March 1997 but left that job in October 1997 due to anxiety over interacting with people. He has no other work history. Klett is now 40 years old, has never married, lives at home with his parents, and has never supported himself financially.

### B.  MEDICAL EVIDENCE BEFORE AUGUST 1, 1985

The record before the ALJ substantiated Klett's lengthy history of psychiatric problems. When Klett was nine years old, Minna Genn ("Genn"), a psychological consultant, evaluated him after he displayed nervous tics and expressed unhappiness in school. Genn found Klett to be introverted and insecure, and recommended that Klett receive psychotherapy. Klett did not present any evidence at the hearing that he received psychotherapy based on that recommendation. Genn did not diagnose Klett in 1972, but in 1999 she reviewed her records from the 1972 evaluation and stated that she would have diagnosed him as suffering from Major Depressive Disorder, recurrent, severe; Generalized Anxiety Disorder; and Chronic Motor Tic Disorder.

---

1. Tourette's Disorder (also known as Tourette's Syndrome) is an inherited neurological disorder characterized by multiple motor tics and one or more vocal tics that occur many times a day over a period of at least one year. See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)* 101–103 (4th ed.1994). Tourette's first appears in individuals before age 18, and causes "marked distress or significant impairment in social, occupational, or other important areas of functioning." *Id.* Other symptoms associated with Tourette's commonly include obsessions and compulsions, hyperactivity, social discomfort, shame, and depression. *See id.*

No other evidence was presented to the ALJ relating to any psychological treatment Klett received before August 1, 1985, but Klett did present reports from several urologists who treated him between June 1984 and August 1, 1985. Dr. Roger Riechers ("Riechers") diagnosed Klett with probable prostatitis in August 1984 after treating Klett for three months for penile pain. Klett attributes much of this pain to a self-inflicted injury incurred during his time studying in England in the Spring of 1984. In his description of Klett, Riechers noted that he was "acutely depressed and anxious over his problem." (Report re. Christopher Klett dated Aug. 2, 1984 by Roger Riechers, M.D., at Tr. 192.) Dr. Jeffrey Rabuffo ("Rabuffo") saw Klett in September and October 1984 for prostatitis and urethritis. Rabuffo noted that Klett's symptoms "seemed to be out of proportion to the physical findings." (Letter dated Oct. 15, 1984 from Jeffrey Rabuffo to Gordon Williams, at Tr. 195.) Dr. John Birkhoff treated Klett between October 1984 and March 1986 for acute prostatitis.

## C. MEDICAL EVIDENCE BETWEEN AUGUST 1, 1985 AND SEPTEMBER 8, 1985

Klett presented no evidence of any medical treatment between August 1, 1985 and September 8, 1985.

## D. MEDICAL EVIDENCE AFTER SEPTEMBER 8, 1985

Klett saw Dr. Yonatan Sokal ("Sokal"), a psychiatrist, for several months in 1987 and 1988. In an October 1990 report, Sokal indicated that Klett suffered from Delusional Disorder, somatic type, and Anxiety Disorder, NOS. Sokal conducted tests which revealed that Klett had Tourette's disorder. Sokal wrote that Klett:

spent much of his waking time thinking about his 'symptoms.' He could not concentrate on work, ... he spent much time thinking about how to rectify his disorder.... As a result of [Klett's] disorders he isolated, could not relate well to others (i.e. superiors coworkers etc.) could not concentrate on work [and] literally believed that he was unable to function.... It is now [and] was my belief [in 1987 and 1988] that Mr. Klett was completely unable to work.

(Report by Sokal dated Oct. 8, 1990 re. Christopher Klett, at Tr. 188.) A series of social workers, therapists, psychologists and psychiatrists treated Klett over the next ten years for depression, anxiety, chronic pain disorder, Tourette's Disorder, and related conditions.

The record contains three reports, dated September 27, 1998, May 28, 1999, and January 31, 2000, from Monica Carsky ("Carsky"), a psychologist who has been treating Klett since 1994. Carsky diagnosed Klett as suffering from "Major Depressive Disorder, severe, with psychotic features and melancholia, chronic; Generalized Anxiety Disorder; Chronic Pain Disorder associated with both psychological factors and general medical condition; and Tourette's Disorder." (Letter dated January 31, 2000 from Carsky to ALJ Katz, at Tr. 218.) In a letter to the ALJ prepared in connection with the hearing on Klett's claim, Carsky wrote that Klett:

suffers from a lifelong psychiatric illness.... He has a lifelong inability to interact normally with others beyond brief periods, and episodically his concentration and judgment have been severely impaired, which have made it impossible for him to work, socialize, or live on his own with any consistency. Therefore, I believe that he has been disabled (unable to function normally sexually, socially and vocationally) since

adolescence or earlier, and he has been continuously disabled since then. (*Id.* at 222.)

The record also contains a letter to the ALJ dated January 31, 2000 from Dr. Mary Kentros ("Kentros"), a psychiatrist who has been treating Klett since January 1999. Kentros wrote that Klett "has had serious symptoms beginning in his late teens, and has remained ill and essentially disabled since then." (Letter dated January 31, 2000 from Kentros to Katz, at Tr. 230.)

### E.   NON–MEDICAL EVIDENCE

In support of his claim for Child's Insurance Benefits, in addition to the medical evidence summarized above, Klett presented evidence from non-medical sources. Klett's mother submitted a written statement describing her son's psychological history since age seven. She described him as depressed, lonely, and detached throughout high school. She wrote that Klett "would remain in his room after school. He never dated, and rarely socialized or went to school events." (Letter dated January 23, 2000 from Patricia Klett to ALJ Katz, at Tr. 184.) She also reported that Klett was unable to complete his college applications on time, and that "[h]e was nervous, shaky, and [made] a poor impression on college interviews, so even though a Merit Scholar, did not get into the schools of his choice." (*Id.* at 184.)

Klett's mother also described Klett's behavior during the summer after his second year of college, when he helped stock shelves at grocery stores. She recounted episodes when Klett "would come home and shake and cry and scream about what a terrible job it was and that he could not do it." (*Id.*) Additionally, she reported

that during the fall of Klett's junior year at Wesleyan, Klett "was not involved in activities, did not date, and would sit in his room in the dark, staring out the dorm window and think about killing himself." [2] (*Id.*)

During his semester in England in the spring of 1984, Klett suffered an episode of genital self-mutilation. Klett's mother wrote that "[f]rom that time on ... he has experienced the fear and pain which have paralyzed and debilitated him." (Id. at 185.)

Klett graduated from Wesleyan in 1985 as an English major with a B plus grade average. At the hearing, Klett testified that during his senior year of college, he rarely attended classes and his grades declined. He acknowledged that he was able to read literature, write essays, and successfully complete his classes.

The record also contains a letter of recommendation dated July 18, 1985 from William Stowe ("Stowe"), a professor of English at Wesleyan who instructed Klett in two classes. Stowe wrote that Klett distinguished himself in a drama class during his sophomore year, and that after that class Stowe offered Klett a position as a teaching assistant, which Klett was unable to accept due to a scheduling conflict. Stowe wrote that Klett's performance was "spottier" in a class Stowe taught during the spring of Klett's senior year in 1985, but he noted that "[w]hen [Klett] spoke, he spoke well, and his writing remained well above average." (Letter of Recommendation for Christopher J. Klett, dated July 18, 1985, from Stowe, at Tr. 187.) Stowe concluded his letter of recommendation by stating that if Klett:

2. Klett's mother does not indicate the source for this information, although presumably it may have been related by Klett himself because it is unlikely that Klett's mother would have been present to observe this behavior.

were to find the time and the will, I think he might well make a career in some kind of writing. . . . If and when he can demonstrate the depth of his interest by producing a substantial body of writing on his own, I think [he] will be ready to profit from and do credit to such a program. Under those circumstances, I would recommend him highly. (*Id.*)

Klett's sister Kerry Klett also submitted a letter in anticipation of Klett's hearing. Kerry Klett wrote that after Klett's semester in England, he "seemed severely anxious and depressed. He was tearful and sad much of the time; he was not interested in participating in any activities." (Letter dated October 20, 1999 from Kerry Klett to ALJ Neil Ross, at Tr. 216.) Kerry Klett wrote that on many occasions between 1987 and 1992 she heard Klett discuss suicide, and she recounted an episode in 1987 when Klett destroyed a wooden bookcase in his parents' home with a baseball bat.

## III. DISCUSSION

### A. STANDARD OF REVIEW

■ The Court will review the findings and conclusion of the Commissioner denying benefits under the Act only to determine whether the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Shaw*, 221 F.3d at 131 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The Court may not reverse the decision of the Commissioner if that decision "rests on adequate findings supported by evidence having rational probative force." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.2002).

### B. DISABILITY STANDARD

For purposes of the case at bar, to receive child's insurance benefits an applicant must: (1) be the child of an individual who is entitled to receive old-age or disability insurance benefits; (2) apply for child's insurance benefits; (3) be unmarried and under a disability which began before age 22; and (4) be dependent upon the old-age or disabled individual if that individual is living when the application is filed. *See* 42 U.S.C. § 402(d)(1).

■ The only issue in this case is whether Klett is under a disability which began before he reached the age of 22. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether an individual suffers from a disability so that he is eligible to recover child's insurance benefits, the ALJ must follow the five-step process set forth in 20 C.F.R. § 404.1520. If at any point during the inquiry the ALJ is able to determine that the applicant is or is not disabled, the ALJ ceases the inquiry and renders a decision. The Second Circuit outlined the five-step inquiry as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask

whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 [to Subpart P of 20 C.F.R. § 404]. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw*, 221 F.3d at 132 (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir.1998)); *see also* 20 C.F.R. § 404.1520. The claimant has the burden of proving that he satisfies the first four requirements. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996). If the ALJ reaches the fifth step in the inquiry, the burden shifts to the Commissioner to prove that the claimant is capable of performing work in jobs in the national economy. *See id.*

## C. THE ALJ'S DECISION

The ALJ issued a ten-page single-spaced decision (the "ALJ Decision") on April 15, 2000 rejecting Klett's claim for child's insurance benefits. The ALJ found that Klett had "a history of urethral sphincter dysergia, recurrent prostatitis, Tourette's Syndrome and a history of anxiety and depression," but he determined that before Klett reached the age of 22 none of these ailments alone or in combination met the legal definition of disability. (ALJ Decision at 9, Tr. 20.) The ALJ referred to the medical reports from Carsky and Kentros that retroactively diagnosed Klett as disabled since at least his teenage years. The ALJ determined that "the treating source's retrospective opinion[s are] contradicted by overwhelmingly compelling non-medical evidence." (*Id.* at 7, Tr. 18.) The ALJ emphasized Klett's own testimony during the hearing and Klett's ability to graduate from Wesleyan in four years as an English major with a 3.3 grade point average during the period in which Klett claims to have been disabled. The letter of recommendation for Klett from Professor Stowe, which was written two weeks before Klett's claimed date of disability, had "particular significance" to the ALJ. (*Id.* at 3, Tr. 15.) Additionally, the ALJ noted the absence of any contemporaneous treating physician reports.

Klett argues that the ALJ erred by basing his denial of Klett's claim on the absence of contemporary treating physician reports. Klett asserts that the ALJ improperly focused on Klett's genitourinary complaints as the basis for Klett's disability because the only contemporaneous medical records related to those ailments. Klett argues that a benefits claimant is not required to submit contemporaneous medical evidence to support a finding of disability.

At the outset, the Court rejects Klett's argument that the ALJ unduly focused on Klett's genitourinary complaints as the source of Klett's alleged disability. The first sentence of the ALJ Decision states that Klett claimed disability "on the basis of Tourette's Syndrome and chronic depression." (*Id.* at 1, Tr. 13A.) The ALJ Decision barely refers to Klett's genitourinary problems and instead focuses on Klett's psychological afflictions and the reports of the doctors and therapists who treated Klett for those disorders.

Klett correctly argues that he is not required to submit contemporaneous medi-

cal evidence to establish disability. Under the so-called "treating physician rule," a retroactive diagnosis from a physician who was treating the claimant during the relevant time period would receive controlling weight unless it was contradicted by other medical evidence or overwhelmingly compelling non-medical evidence. *See Rivera v. Sullivan*, 923 F.2d 964 (2d Cir.1991); *Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856 (2d Cir.1990); *Martinez v. Massanari*, 242 F.Supp.2d 372 (S.D.N.Y.2003). The situation here is somewhat different because the retroactive diagnoses Klett submitted to the ALJ were from physicians who began treating Klett for his psychological problems after the relevant time period. An ALJ should attribute significant (though not controlling) weight to a retrospective diagnosis from a physician who is currently treating a claimant but who was not treating the claimant during the relevant time period. *See Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir.1981); *Martinez*, 242 F.Supp.2d at 377; *Campbell v. Barnhart*, 178 F.Supp.2d 123, 134 (D.Conn.2001). As the ALJ noted, a retrospective diagnosis from a physician, particularly one who was not the claimant's treating physician during the relevant time period, may carry less weight if the diagnosis is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(4); *Dousewicz*, 646 F.2d at 774; *Peguero v. Massanari*, No. 00 CIV. 173, 2001 WL 1029048 (S.D.N.Y.2001).

When an ALJ is presented with evidence from a treating physician, the ALJ shall accord that evidence controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If the ALJ determines that the medical evidence from a treating physician is not well-supported by accepted medical techniques or is inconsistent with other substantial evidence in the record, then the ALJ must determine how much weight to accord that evidence based on a consideration of at least four factors: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Shaw*, 221 F.3d at 134.

In the case at bar, the ALJ determined that the medical evidence presented, particularly the retrospective diagnoses from Klett's current treating physicians, Carsky and Kentros, was "contradicted by overwhelmingly compelling non-medical evidence." (ALJ Decision at 7, Tr. 18.) The ALJ stated that Kentros's and Carsky's retrospective opinions were:

> not consistent with [Klett's] own statements concerning his functional abilities during the Relevant Period. Such statements demonstrate that [Klett's] ability to function was greater than that to which these mental health specialists indicate. Added to the paucity of medically acceptable clinical data during the Relevant Peiod, one cannot regard these opinions as well-supported; consequently, I have considered their opinions but have given less weight to them than would otherwise be mandated.

(*Id.*)

The ALJ emphasized other evidence in the record that contradicted the medical opinions of Carsky and Kentros. The ALJ found it "significant" that Klett attended college for four years away from home, completed his coursework, received a letter of recommendation from one of his professors, and graduated with a B plus

average as an English major from Wesleyan University during the time that Kentros and Carsky characterized Klett as disabled.

Contrary to Klett's assertions, the ALJ did not reject Klett's claim based on a failure to submit contemporaneous medical records. Certainly the ALJ could not help but note the absence of any contemporaneous medical records from the period that Klett claims to have been disabled. But the ALJ's written decision indicated that that deficiency did not form the basis for his denial of Klett's claim.

Klett was undeniably a troubled individual during his college years and has been for much of his life. Given the nature of his ailments, it is virtually impossible to pinpoint a specific date on which he became legally disabled. But the issue for the Court to resolve is not whether Klett presented evidence supporting his claim that he was disabled during the relevant period, but whether the record contained substantial evidence supporting the ALJ's determination that Klett was not disabled at that time. Where there is substantial evidence supporting either position, the Court must defer to the determination of the factfinder. See DeChirico, 134 F.3d at 1182; Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.1990); Rosado v. Barnhart, 290 F.Supp.2d 431, 436 (S.D.N.Y.2003). The ALJ conducted a careful and thorough evaluation of all the evidence on the record before him and explained his denial of Klett's claim in a detailed written decision. The retrospective diagnoses from Kentros and Carsky are reasonable, but substantial evidence supports the ALJ's decision that Klett was not disabled before his twenty-second birthday and thus warrants his corresponding denial of Klett's claim.

## IV. ORDER

For the reasons stated above, it is hereby

ORDERED that the motion of plaintiff Christopher Klett for judgment on the pleadings is denied, and the cross-motion of defendant Jo Anne Barnhart (the "Commissioner") for judgment on the pleadings is granted. The decision of the Commissioner is affirmed.

The Clerk of Court is directed to close this case.

**SO ORDERED.**