**John E. FISHER, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.**

**Civil No. 3:03CV904(CFD)(TPS).**

United States District Court,
D. Connecticut.

March 24, 2005.

David E. Mandell, Norwich, CT, for Plaintiff.

Ann M. Nevins, Bridgeport, CT, Douglas P. Morabito, New Haven, CT, for Defendant.

DRONEY, District Judge.

Upon review and pursuant to 28 U.S.C. § 636(b)(1) and Rule 2 of the Local Rules for United States Magistrate Judges (D. Conn.), and after review of the objections filed, U.S. Magistrate Judge Thomas P. Smith's Opinion [Doc. # 18] is APPROVED AND ACCEPTED in its entirety. The Clerk is directed to close this case. So ordered.

## MAGISTRATE JUDGE'S OPINION

THOMAS P. SMITH, United States Magistrate Judge.

The plaintiff, John E. Fisher, brings this appeal under 42 U.S.C. § 405(g) (2000) seeking review of a final decision by the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits. (Dkt. # 2). The plaintiff has moved for an order reversing the Commissioner's decision or, in the alternative, for an order remanding his case back to the SSA for further proceedings (Dkt. # 7) and the defendant has moved for an order affirming her decision. (Dkt. # 10). For the reasons stated below, the plaintiff's motions for judgment and remand should be **DENIED.** The defendant's motion should be **GRANTED.** 28 U.S.C. § 636(b)(1)(A).

## I. ADMINISTRATIVE PROCEEDINGS

On February 28, 2000, Mr. Fisher initially applied for supplemental security income ("SSI") benefits. (Tr. 113–118). The SSA denied his application initially on April 21, 2000 (Tr. 71–74) and upon reconsideration on August 17, 2000. (Tr. 76–79). Mr. Fisher appealed this decision and requested a hearing by an administrative law judge ("ALJ"). (Tr. 80). A hearing was held on June 20, 2001 before ALJ Robert E. Thorne. (Tr. 32–62). Having considered the plaintiff's claim *de novo* the ALJ determined, in a decision dated January 16, 2003, that the plaintiff was not disabled within the Social Security Act (the "Act"). (Tr. 20–29). Subsequently, on May 8, 2003, the Appeals Council of the SSA denied the claimant's request for review, thereby rendering the ALJ's decision the final decision of the SSA. (Tr. 7–9). As a result, the claimant filed this complaint on May 19, 2003. (Dkt.# 2).

## II. STATEMENT OF FACTS

Mr. Fisher is a forty-three year-old male with a ninth-grade education[1] who lives with his wife at his father's house. (Tr.

1. Mr. Fisher ultimately obtained his GED, but has no other formal education. (Tr. 36–37).

36–37, 42). As a result of certain learning and behavioral problems, he was enrolled in special education classes in the Mountville schools. (Tr. 36–37, 154). However, he refused to attend classes, opting instead to "wander[ ] around the school and receive[ ] approximately four hours of instruction a week at home." (Tr. 146).

Mr. Fisher's employment history begins where his formal education leaves off. (Tr. 37). He worked as a gas station attendant around the time he quit school. (*Id.*). He was a janitor from 1979 to 1980. (*Id.*). In 1980, he worked for three months as a grinder at the Electric Boat plant in Groton. (*Id.*, Pl.'s Mem. Supp. Mot., 9/16/03, at 2). From 1980 until 1982, he worked as a laborer at Connecticut Paperboard "hooking paper, sqeegying stock, picking up loose paper, just whatever they told me to do to help out." (Tr. 37–38). At Connecticut Paperboard, he was required to lift objects up to approximately 100 pounds. (Tr. 38). After a year and a half respite due to a broken leg, Mr. Fisher worked at Stone Container from 1984 until 1999 doing similar work.[2] He was let go by Stone Container "because of [his] disabilities" in July 1999, and has not worked since. (Tr. 38–39). He alleges a disability date of July 14, 1999. (Pl.'s Mem. Supp. Mot., 9/16/03, at 2).

Mr. Fisher's medical history of record begins on April 12, 1978 with injuries sustained as a result of an automobile accident on March 11. (Tr. 146). D.C. Cavicke, M.D. of Lawrence and Memorial Hospitals in New London, Connecticut ("Lawrence") diagnosed the plaintiff with a cerebral concussion and behavioral reaction to adolescence. (*Id.*). Mr. Fisher returned to Lawrence on June 21, 1978, when D.S. Weinstein noted "no obvious fracture of the left maxilla ... [but that] soft tissue in the nasal cavity is probably related to the recent trauma." (Tr. 151).

On September 30, 1978, Mr. Fisher was involved in a second automobile accident: he drove his truck over a cliff while intoxicated. (Tr. 153). At Lawrence, Louis Coulson, M.D. diagnosed him with a fracture of the right femoral shaft, a cerebral concussion, acute bronchitis, toxic hepatitis, and possibly alcoholism. (*Id.*). He was also noted to have sustained a "hairline fracture of the pelvis." (Tr. 155). After surgery (an open reduction and Schneider rodding), "he did well and the wound healed per primam." (Tr. 153).

Mr. Fisher returned to Lawrence in February of 1981 to remove the Schneider rod. Dr. Coulson stated that since the accident "he has done well. His femur has healed well and he has been fully active, however, he has persistent symptoms primarily at the upper end of the nail where it protrudes from the trochanter and slightly in the iliotibial band lower down." (Tr. 166). The removal went "quite well." (*Id.*).

Following a motorcycle accident in August of 1982, Mr. Fisher was again admitted to Lawrence. (Tr. 186). Donald Sprafke, M.D. diagnosed him with a fracture of the right tibia and fibula and performed a closed reduction of the injury. (Tr. 184). Mr. Fisher "progressed well" with his treatment until August 29 "when he was nowhere to be found and was seen by a nurse leaving the hospital ... without being discharged...." (*Id.*). He returned on October 10, when J. Sutphen, M.D. noted that the "fractures of the distal tibia and fibula remain well aligned and show evidence of healing." (Tr. 181). However,

---

**2.** The transcript is not clear regarding to which job he refers, (*see* 38–39), but he later states that he performed approximately the same function for both Connecticut Paperboard and Stone Container. (Tr. 39) ("I was a laborer. Same jobs, paper mill jobs.").

on January 4, 1983, P.M. Molloy, M.D. observed that "[t]here has been a rather marked change in the position of the major tibial and fibular fracture fragments in that there is now ventral angulation of the fragments compared to the examination of 10–10." (Tr. 280). Dr. Molloy also noted "[c]onsiderable calcific callus formation ... around these partially healed fractures which appear to have a stable bony union." (*Id.*). That said, on March 1, 1983, L. Copertino, M.D. noticed that "all fracture sites appear to be essentially completely healed." (Tr. 174).

Ignoring an August 8, 1990 record of a cyst removal, Mr. Fisher's medical history continues on August 20, 1996, his first meeting with William R. Cambridge, M.D. as a result of complaints of "bilateral anterior knee pain, left shoulder discomfort with grinding and pain doing any over head work." (Tr. 207). Dr. Cambridge noted some tenderness and crepitus over the left shoulder but that Mr. Fisher retained full range of motion ("ROM"). (*Id.*). Because radiographs of the left shoulder "revealed a significant spur projecting inferiorly from the acromion....," Dr. Cambridge recommended an MRI. (*Id.*). An MRI was performed by William D. Donovan, MD, of The William W. Backus Hospital of Norwich, Connecticut ("Backus"), from which it was determined that the "supraspinatus muscle and tendon are intact." (Tr. 208). Still, his impression was mild hypertrophic AC joint changes, *chronic tendinopathy v. partial tear*, and subscapularis tendon. (*Id.*).

Dr. Cambridge performed a "resection of distal clavicle biplane NEER acromioplasty and partial bursectomy on September 26, 1996." (Tr. 210). The operation went forth "without incident" and the postoperative diagnosis was a level II impingement, severe bursitis, and rotator cuff tendinitis. (*Id.* at 209–10).

On October 8, 1996, Mr. Fisher began a series of follow-up visits to Dr. Cambridge. (*See* Tr. 211). On that date, Dr. Cambridge noted that he "has done very well" and has "[g]ood passive ROM." (*Id.*). He also found that he "may return to work without restrictions." (*Id.*).

He returned on November 19, 1996, when Dr. Cambridge commented that he "is doing very well. He returned to work the day after surgery and has gone to work consistently." (Tr. 213). He also thought that Mr. Fisher was "over-doing it" as he did experience some discomfort, but that his "wound is healing nicely." (*Id.*). Mr. Fisher returned on November 26, 1996 after exacerbating his left shoulder while "out cutting five cords of wood." (Tr. 212). An examination revealed "some mild grinding" but was otherwise unremarkable. (*Id.*). Dr. Cambridge observed that Mr. Fisher "does have significant discomfort [but] I believe it is simply from overuse." (*Id.*). He recommended that Mr. Fisher take a few days off from work. (*Id.*).

On January 8, 1997, Dr. Cambridge noted "minimal discomfort in his left shoulder," (Tr. 214), but on February 28 he "present[ed] with moderate to severe pain radiating across the right shoulder" as a result of a wrenching injury. (Tr. 215). An examination revealed that the "wound has healed nicely" but that he had a strain with uncomfortable ROM and a contusion of the left shoulder. (*Id.*). He was cleared to return to work after the weekend. (*Id.*).

Mr. Fisher did not return to Dr. Cambridge until November 21, 1997 when he suffered from crepitus and discomfort in his left shoulder. (Tr. 216). Dr. Cambridge thought that "his posture also contributed to it a bit. He is terribly round shouldered." (*Id.*). He administered Cortisone. (*Id.*).

On December 2, 1997, Mr. Fisher returned "complaining of pain and paresthesias radiating down his left arm into his hand status post decompression of the left shoulder impingement." (Tr. 217). Dr. Cambridge surmised that he "probably pushed the shoulder too hard." (*Id.*). Because a radiograph revealed marked hypertrophic changes at C6–7 of the cervical spine, he suggested an MRI. (*Id.*).[3] Accordingly, an MRI performed by Kevin L. Quinn, M.D. at Backus on December 15 revealed a left C6–7 spondylitic change resulting in foraminal narrowing. (Tr. 218). As Dr. Cambridge later remarked, "[t]his is consistent with his complaints of pain going down the lateral aspect of his neck to his shoulder." (Tr. 219). Still, he conceded that "[t]here is nothing much to do at this point." (Tr. 219).

On December 26, 1997, Mr. Fisher visited Dr. Donovan for a chest examination. (Tr. 334). His impression was of minimal anterior wedging of a mid-thoracic vertebral body, but noted that this was "likely developmental." (*Id.*).

Mr. Fisher returned to Dr. Cambridge on January 9, 1998 with continued shoulder pain and grinding. (Tr. 220). Dr. Cambridge noted that he "has been building stone walls for the last several months and antagonizing the shoulder" and recommended another MRI. (*Id.*). The MRI, which was performed by Gail R. Weingast, M.D. at Backus on February 28, signaled "[p]ostop changes within the left shoulder with increased signal in the suprapinatus tendon consistent with tendinopathy." (Tr. 221, 335).

On March 2, 1998, Dr. Paul Deutsch referred the plaintiff to David S. Thompson, M.D. for evaluation of his head and upper extremity tremor. (Tr. 191). Mr. Fisher stated that he had tremors in high school and they have increased. (*Id.*). He also admits that his father and brother experience similar symptoms. (*Id.*). Dr. Thompson's examination was unremarkable. His impression was a familial essential tremor and probable migraine headaches and he prescribed a low dose on Inderal LA 80. (*Id.* at 192). Upon Mr. Fisher's return on March 17, 1998, Dr. Cambridge noted no impingement and that he "has stopped doing heavy physical work and the shoulder is feeling better." (Tr. 222).

On June 29, 1998, Mr. Fisher went to the emergency room at Backus complaining of left-sided chest discomfort. (Tr. 193). An examination conducted by Pamela Whibby, PA-C was largely unremarkable. (*See* Tr. 193–94). She diagnosed him with an acute left chest wall strain and prescribed him Motrin 600 mg # 20 and Tylox # 3. (*Id.*). He returned to the emergency room on July 13, 1998 complaining of left rib pain. (Tr. 196) Again, an examination conducted by Ms. Whibby was unremarkable. (*See* Tr. 196–97). She diagnosed him with acute pleurisy and prescribed Vicodin # 20 and suggested that he not work for a few days. (*Id.*).

On July 30, 1998, Dr. Cambridge operated on Mr. Fisher. (Tr. 225). He observed a "markedly thickened subacromial bursa" and resected it, but found that "[t]he rotator cuff was intact" and that "[t]here was no evidence of impingement." (*Id.*). The surgery progressed without incident. (Tr. 226). During a follow-up on August 5, 1998, Dr. Cambridge stated that "[t]he patient feels better now than he did before the surgery." (Tr. 227). Similarly, on September 8, 1998, Dr. Cambridge re-

---

**3.** Dr. Donovan also examined the plaintiff on December 2, 1997 as well and noted "lower cervical degenerative disc and joint disease ... [n]o traumatic abnormality." (Tr. 241, 332).

marked that Mr. Fisher was "[m]aking an excellent recovery" and that he "has a full range of motion, some mild crepitus" but is "asymptomatic." (Tr. 228). He noted that he had not been building any stone walls and could return to work on September 15. (*Id.*).

However, on October 16, 1998, Dr. Cambridge suggested that Mr. Fisher "needs a job change [as he] is using his hand too much lifting at work." (Tr. 229). He continued that "[a]lthough his shoulder responds nicely to the surgery, the repeated lifting at work causes increasing shoulder pain. I agree with a job change." (*Id.*).

Mr. Fisher did not return to Dr. Cambridge until January 26, 1999, at which time he noted that "[t]his patient seems to have recurrent bursitis in his left shoulder. He is not having that much difficulty but he is working in a job at a paper mill that requires 8 hours a day lifting." (Tr. 230). He reiterated that Mr. Fisher "essentially needs another job." (*Id.*). However, on March 24, 1999, he returned having again exacerbated his left shoulder pain rebuilding a stone wall. (Tr. 231). The exam was unremarkable. (*Id.*). The plaintiff admitted that "he gets relief with his Skelaxin [prescription]," and, as such, it was reordered. (*Id.*). He returned again on May 5, 1999 for the same reason, as a result of the same activity ("laying stone walls") and was given Cortisone. (Tr. 232).

On June 7, 1999, Mr. Fisher visited Peter J. Rosenberg, M.D. for evaluation of his ears and hearing. (Tr. 199–200). An audiogram was performed, but was unremarkable. (Tr. 200). Dr. Rosenberg concluded that Mr. Fisher's "high frequency sensorineural hearing loss is not in the range to affect speech but . . . is probably due to prolong[ed] noise exposure." (*Id.*). He recommended that the plaintiff wear

ear protectors if exposed to loud noise. (*Id.*).

The next day, Mr. Fisher returned to Dr. Cambridge. (Tr. 233). Apparently, he had again been "building stone walls and developed some sharp pain radiating down the medial aspect of his left arm . . . [which] slowly cleared over a few days." (*Id.*). Still, he retained full ROM. (*Id.*). Dr. Cambridge's impression was that of an acute muscle strain. (*Id.*).

On June 12, 1999, Mr. Fisher again visited the emergency room at Backus complaining of right leg pain as a result of "banging [it] against a machine area." (Tr. 203). The examination conducted by Matthew J. Pike, PA-C was, for the most part, unremarkable, and he diagnosed the plaintiff with an acute contusion of the right lower leg. (*Id.*). Mr. Pike gave him Darvocet for that night and recommended Tylenol or Motrin. (Tr. 203–04).

Mr. Fisher returned to Dr. Cambridge on June 30, 1999 as a result of hitting his left leg against a stanchion in a tow motor. (Tr. 234). His exam was unremarkable and Dr. Cambridge believed he had suffered a contusion and self-limiting neuralgia. (*Id.*)[4]

The record indicates that Mr. Fisher did not return to Dr. Cambridge until October 15, 1999. (Tr. 235). Dr. Cambridge stated that he

continues to work doing masonry work building stone walls and he has a chronic bursitis of his left shoulder. He has undergone a decompression that was very successful. He reinjured the shoulder and underwent a second exploration with removal of a thickened chronically inflamed bursa. He did well after this surgery. The patient continues to do

---

4. The court notes that this is the last medical record before the alleged onset date of July 14, 1999. (Pl.'s Mem. Supp. Mot., 9/16/03, at 2).

heavy physical work, and the bursitis has been reoccurring over a long period of time.

Radiographs taken today show no change from the last radiographs. He has a well decompressed shoulder including resection of the distal clavicle.

On examination, the patient has marked crepitus with a full R.O.M. The patient states that he has a high tolerance for pain.

(Tr. 235). Dr. Cambridge gave him an injection of Cortisone and warned that "[i]f he continues to do heavy manual labor, we will in all likelihood reexplore the shoulder and remove more thickened fibrotic bursa." (*Id.*).

On January 12, 2000, Dr. Cambridge noted that Mr. Fisher "is working heavy physical labor and continuing to complain of some grinding and some pain about the left shoulder." (Tr. 236). He thought that Mr. Fisher could also have a carpal instability. (*Id.*). The exam was otherwise unremarkable. (*See id.*). He returned on February 15, 2000 complaining of right ankle pain, some instability, and swelling and Dr. Cambridge suggested that he use an ankle brace. (Tr. 237). His impression was probably mild low grade synovitis and early arthritic changes. (*Id.*).[5]

Upon referral, Mr. Fisher visited Ajay I. Dalal, M.D. of the Norwich Radiology Group, P.C. for an examination of his right femur. (Tr. 243). Dr. Dalal observed "excessive new bone formation ... along the [old] fracture site" which gave him the impression of myositos ossificans at the midshaft of the right femur posterolaterally. (*Id.*). Seven days later, Mr. Fisher visited Ronald S. Jolda, D.O. for a Disability Physical Exam. (Tr. 244–46). Dr. Jolda's assessed that

1. He has chronic bursitis probably with calcium in the left shoulder and less so in the right shoulder—he is right handed. 2. He has a short right leg (2 fractures—by about ½ inch. 3. He has a tremor of the entire body. This could be ascribed to a familial tremor and he has a family history of this. He however failed the Inderal test. I am not so quick to write it off as this with the rest of the picture. He has a heightened pain index and there may be psych issues here that are not being addressed. I think that this may be playing a role in his tremors. [4.] Headaches—? common migraine v. mixed headaches.

(Tr. 246).

On April 18, 2000, Bilquis Khan, M.D. completed a Residual Functional Capacity ("RFC") Assessment concerning the plaintiff. (Tr. 247–54). Regarding Mr. Fisher's exertional limitations, Dr. Khan found that he could occasionally lift and/or carry (including upward pulling) twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for about six hours in an eight-hour workday, could sit (with normal breaks) for about six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull (including operation of hand and/or foot controls). (Tr. 248). Regarding Mr. Fisher's postural limitations, Dr. Khan found that he could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 249). In addition, Dr. Khan found no limitations of manipulation, vision, communication, or environment. (Tr. 250–51). He also remarked that Mr. Fisher's claim of disability is "not credible [as it is] not substantiated by [the medical record]." (Tr. 252).

---

**5.** The court notes that this is the last record before Mr. Fisher filed his initial application with the SSA. (Tr. 20).

Mr. Fisher returned to Dr. Cambridge on May 3, 2000 complaining of right ankle discomfort. (Tr. 257). Dr. Cambridge stated that the plaintiff has chronic synovitis of the ankle and a malunion of the tibia. (*Id.*). He returned again on May 31 complaining of polyarthralgia. (Tr. 287). Dr. Cambridge suggested that he see a rheumatologist. (*Id.*). His next visit was on July 7, 2000 when Dr. Cambridge referred him to Dr. Lacks. (Tr. 256, 288).

On August 15, 2000, M. Lorenzo, M.D. completed an RFC assessment of the plaintiff. (Tr. 259–66). Regarding Mr Fisher's exertional limitations, Dr. Lorenzo found that he could occasionally lift and/or carry (including upward pulling) twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for about six hours in an eight-hour workday, could sit (with normal breaks) for about six hours in an eight-hour workday, but that he was limited in pushing and/or pulling (including operation of foot controls) in the lower extremities, but was unlimited in the upper extremities. (Tr. 260). Regarding Mr. Fisher's postural limitations, Dr. Lorenzo found that he could never climb ladders, ropes, or scaffolds, but could occasionally climb (ramps and stairs), balance, stoop, kneel, crouch, and crawl. (Tr. 261). Regarding his manipulative limitations, Dr. Lorenzo found that Mr. Fisher was limited in reaching overhead, but otherwise unlimited. (Tr. 262). Moreover, Dr. Lorenzo found no visual, communicative or environmental limitations save exposure to hazards. (Tr. 263).

Mr. Fisher returned to Dr. Cambridge on September 27, 2000 after visiting a rheumatologist. (Tr. 289). Apparently, the rheumatologist found that he has multiarticular osteoarthritis and he is now ambulating with a cane. (*Id.*). Dr. Cambridge suggested an MRI of the right an-

kle which came back normal. (Tr. 289–90). He again returned on October 17, 2000 when Dr. Cambridge remarked that the plaintiff had "a valgus attitude to the right lower leg causing ankle discomfort" but that radiographs of the hand "revealed no significant arthritis." (Tr. 291). His impression was early degenerative arthritis of the hands and ankle. (*Id.*).

On or around December 20, 2000, upon the referral of Dr. Cambridge, Mr. Fisher met with Santhanam Lakshminarayanan. (Tr. 267–68). Dr. Lakshminarayanan found that "[t]he only explanation for the distribution of the pains is on the basis of degenerative joint disease. No systemic disease would explain the distribution of this pain in the [sic] light of the history does not reveal anything to suggest an inflammatory arthritis." and concluded that Mr. Fisher has multi-joint osteoarthritis. (Tr. 267). However, he prescribed the plaintiff Relafen "and he said it helps most of his symptoms when he was seen on follow-up." (Tr. 268).

Mr. Fisher returned to Dr. Cambridge on January 9, 2001 complaining of "marked pain and crepitus, which has increased significantly across the left shoulder and into his arm." (Tr. 293). He recommended an MRI, which subsequently suggested a probable rotator cuff tear or, less likely, subacromial fluid collection. (Tr. 292–93). A couple of weeks later, Dr. Cambridge remarked that a rotator cuff tear "is probably going to be consistent with chronic pain, dysmobility, and marked crepitus of the shoulder." (Tr. 294). As a result, he scheduled Mr. Fisher for surgery. (*Id.*).

Dr. Cambridge performed the surgery on February 12, 2001. (Tr. 279, 295). He observed that "on the lateral-most aspect of the clavicle ... the patient had some impingement of the greater tuberosity, with rotational motion over head." (*Id.*).

Dr. Cambridge also noted that the plaintiff "had a large, mostly transverse, but slightly stellate rotator cuff tear." (*Id.*). He performed a bursectomy and Mr. Fisher was brought to recovery without incident. (*Id.*). Over a month post-surgery, Dr. Cambridge stated that Mr. Fisher "has done well...." (Tr. 296). He noted that "[a]ll the crepitus is gone in his shoulder," that he has excellent ROM and that he "will resume normal activities." (*Id.*).

Mr. Fisher returned to Dr. Cambridge on April 27, 2001. (Tr. 273, 297).[6] The record indicates that

> [h]is tremors seem to be increasing. He has a malunion of the right tibia and degenerative arthritis of the right ankle. He also has degenerative arthritis of the cervical spine. He has a rotator cuff tear of the left shoulder, and has recently gone through a third operation for a bursectomy and rotator cuff tear repair.
>
> . . . .
>
> ... His problems will last indefinitely. Medication is required. Presently, he is on low doses of Vicodin, and is handling the medication well. He suffers from chronic pain, and this prohibits him from returning to his previous employment. He does have difficulty climbing stair, walking distances, and pulling or lifting any objects weighing more than 10 to 15 pounds. Basically, I believe the patient is unemployable.

(*Id.*). Approximately two months later, Dr. Cambridge reiterated that "[t]he patient is unemployable" after admitting that, rheumatologically, all that can be done for Mr. Fisher has been done. (Tr. 298).

On July 30, 2001, Dr. Donovan examined Mr. Fisher because of back pain. (Tr. 300). His impression was that the plaintiff suffered from osteopenia, but that did not have focal osseous lesions. (*Id.*).

On August 31, 2001, Dr. Cambridge completed an Impairment Certificate concerning Mr. Fisher. (Tr. 318). There, he certified that Mr. Fisher cannot walk two hundred feet without stopping to rest. (*Id.*). Furthermore, he noted that Mr. Fisher cannot walk without a cane, that his limited ability to walk is arthritic and orthopedic, and that the condition is permanent. That same day, in his progress notes, Dr. Cambridge stated that "[t]his patient, who is totally disabled, was attacked by a gang of teenagers and roughed up. The shock has exacerbated his neurological condition and has also put a stress on his arthritic joints." (Tr. 301). He remarked that the plaintiff's "global problems, at this point, are beyond the scope of orthopedics" and referred him to pain management. (*Id.*).

Mr. Fisher did not return to Dr. Cambridge until January 8, 2002. (Tr. 302). Apparently, his father had a stroke and he had exacerbated his left shoulder discomfort "from lifting his father repeatedly." (*Id.*). On examination, Dr. Cambridge noted some tenderness and very mild crepitus and administered Cortisone. (*Id.*).

Later that month, presumably in anticipation of the hearing before ALJ Robert Thorne, Dr. Cambridge dictated a letter to Mr. Fisher's attorney, David Mandell, in which he surmised that "the patient remains unemployable. He is an excellent candidate for social security. He is able to ambulate short distances with the aid of a cane and he remains on medication." (Tr. 274, 285).

Two days later, on January 29, 2002, the ALJ conducted a hearing in this case.

---

**6.** This record is the first to be carbon-copied to Mr. Fisher's attorney, David Mandell. (*See* Tr. 273).

(*See* Tr. 34–62). At the hearing, Mr. Fisher denied being able to lift any heavy objects and stated that he has difficulty climbing stairs. (Tr. 40–41). He noted that he suffers from chronic pain and that, as a result, he is unable to perform any household chores. (Tr. 41–42).

John W. Axline, M.D., an orthopedic surgeon, also testified. (*See* Tr. 44). Dr. Axline noted several conflicts between the medical record and Mr. Fisher's testimony:

> [h]e described a crush[ed] hand, but he had a fractured fifth metacarpal ... [and h]e said he had rotator cuff tears, but actually what he had was a crowding of the shoulder tendons by the acromion which was a recepted on two occasions and on surgery the rotator cuff was found to be anatomically intact.[7]

(Tr. 45). He also pointed to what he believed to be "interesting" aspects of Dr. Cambridge's notes:

> Dr. Cambridge's notes are interesting because in 2000 he described his tibia as healed, the tibia's healed by numerous tests as having a mild deformity, but in the note he gave today he calls it a mild union. Since it's healed it hasn't changed, so he'd had two different opinions on the same bone, which is interesting.

(*Id.*). He added that Mr. Fisher "had a hairline fracture of the pelvis, which is not commented on further and numerous mentions of the fact that his complaints are not consistent or, perhaps, exaggerated." (Tr. 46).

Still, Dr. Axline admitted that, while his ankle/tibia deformity is mild, the plaintiff would have "some limitation to prolonged walking" but no limitation with regards to standing, sitting, or lifting [8]. (Tr. 47). Moreover, he did not find Dr. Cambridge's diagnosis of degenerative arthritis of the right ankle to be supported by medical evidence: "He doesn't have narrowing of the joint. He doesn't have swelling.... He has no infusion, no inflammation." (Tr. 48). While he agreed that the plaintiff suffers from degenerative arthritis of the cervical spine, Dr. Axline took issue with the allegation of a rotator cuff tear of the left shoulder.[9] (Tr. 48–49).

Further, Dr. Axline had no reason to disagree with Dr. Cambridge that Mr. Fisher "suffers from chronic pain" and that it "prohibits him from returning to previous employment." (Tr. 49). However, he found the medical evidence supporting Dr. Cambridge's RFC assessment to be lacking and internal inconsistencies in the record. (Tr. 50). In addition, he disagreed with Dr. Lakshminarayanan's diagnosis of multi-joint osteoarthritis as "you can see that that's not true looking at his hands here today." (Tr. 51). Dr. Axline also stated that he believed that the plaintiff was capable of working for his previous employer, Stone Container. (Tr. 53). Still, he suggested that Mr. Fisher receive a current examination, as the follow-up notes in the record were limited. (Tr. 56–57).

Upon the advice of Dr. Axline, Mr. Fisher visited John W. O'Brien of Physical Medicine & Rehabilitation Associate in New Haven on April 3, 2002 for a current

---

**7.** At that time, Dr. Axline did not possess any record of the February, 2001 surgery. (Tr. 49).

**8.** With regards to lifting, Dr. Axline noted that Mr. Fisher "was lifting stones to build stone walls" in 1999. (Tr. 48).

**9.** Again, Dr. Axline did not take into consideration the report of the third operation because, at that time, the operative report had not been provided. (Tr. 49).

examination. (Tr. 339–44). Upon examination, Dr. O'Brien found that, in "regards to his current functional status, he currently is significantly limited by the nonunion on his right lower extremity, his left shoulder injury, his concussion with an abnormal EEG, as well as his resting tremor." (Tr. 340). He also remarked that his nodular osteoarthritis "also limits him to some degree." (*Id.*).

With regards to his RFC, Dr. O'Brien admitted that he is able to lift ten pounds, can stand for less than two hours, and sit alternating with standing on a regular basis. (*Id.*). He also found that Mr. Fisher is able to push and pull with his upper and lower extremities. (*Id.*). While he did not think it would be wise for the plaintiff to climb, balance, kneel, crutch, crawl or stoop, he acknowledged that he is "unlimited for fingering and feeling as he does have a good motor strength as well as sensation in both upper extremities." (*Id.*). Further, while Mr. Fisher can occasionally reach, he is not limited in terms of hearing or seeing. (*Id.*). Finally, he "is limited in regards to subjectively . . . having problems with temperature extremes, noise, vibration, humidity and hazards, but not limited in regards to dust and fumes." (*Id.*).

ALJ Thorne issued his ruling on January 16, 2003. (Tr. 20–29). He admitted that the

> medical evidence indicates that the claimant has degenerative arthritis of the right ankle, malunion of the right tibia, status post rotator cuff tear, left shoulder with residual pain, degenerative disc disease cervical spine, status post right femoral fracture (September 1978) with open reduction and internal fixation, status post right tibia and fibula fractures (August 1982), status post re-

section of distal clavicle, acromioplasty and partial bursectomy (September 1996), status post acromioplasty and partial bursectomy, left shoulder (July 1998) and status post acromioplasty with repair of rotator cuff (February 2001).

(Tr. 22). While he conceded that these impairments are severe, he found that they were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P of the regulations. (*Id.*).

The ALJ drew liberally from Dr. Cambridge's records. (Tr. 22–26). He noted *inter alia* that, in September of 1998, Dr. Cambridge stated that Mr. Fisher "needs a job change" which "would indicate that Dr. Cambridge was not suggesting the claimant could not perform all work but rather just his past heavy work." (Tr. 23). According to the ALJ, this indication is buttressed by Dr. Cambridge's notes in March of 2001 when he cleared Mr. Fisher to resume normal activities. (Tr. 24). In addition, ALJ Thorne highlighted Dr. Cambridge's opinion that Mr. Fisher should avoid climbing stairs, walking distances and pulling or lifting any objects weighing more than ten to fifteen pounds as indicating that "while the claimant's functional capacity is reduced[,] he is still capable of performing at least sedentary work activity, as Dr. Cambridge placed no restriction on his ability to sit." (Tr. 24–25). The ALJ also found Dr. Cambridge's statement that Mr. Fisher is unemployable to be inconsistent with his functional assessment. (Tr. 25).

ALJ Thorne also considered the testimony of Dr. Axline which indicated that the "claimant's complaints of pain [are] not borne out by the record . . . ." and Dr. O'Brien's and Dr. Jolda's records.[10] (Tr. 24–25). He found that

---

10. The ALJ certified that he "considered all of the medical opinions in the record regarding

[w]hile the claimant is limited based on some residual symptoms, the limitation to essentially sedentary work adequately provides for these conditions, as there is no indication from the record that he is unable to sit or use his hands for fine fingering and feeling. While Dr. Cambridge opines that the claimant is 'unemployable' with these limitations, this finding is given no weight in light of the lack of objective evidence [of] any significant abnormalities that would preclude all work, including Dr. Cambridge's own treatment notes and the other substantial evidence of record.

(Tr. 26). Based upon the record, ALJ Thorne found that Mr. Fisher retained an RFC to "lift/carry up to 10 pounds occasionally, sit up to 6 hours and stand/walk up to 2 hours in an 8–hour workday." (*Id.*).

Furthermore, the ALJ considered Mr. Fisher's subjective complaints but found them to be

inconsistent with the objective medical evidence and other substantial evidence of record. The claimant's physical limitations, including tremors are fully compensated by a limitation to sedentary exertion. While it is found, based on medical evidence, that the claimant may well experience some leg and upper extremity discomfort, he is found not credible as to the degree of his discomfort.

(Tr. 26). He noted that Mr. Fisher's "pain complaints are only exacerbated with heavy lifting" such as lifting his father, that he admittedly had "a high threshold for pain," and that "medication relieves his symptoms." (Tr. 26). Finally, using the Medical–Vocational Guidelines of Appendix 2 of Subpart P of the regulations (the "Grid"), and based upon a sedentary RFC

the severity of the claimant's impairments." (Tr. 28). Of course, he need not specifically mention *every* record in his opinion. *See*

classification, ALJ Thorne determined that the plaintiff was not disabled. (Tr. 27).

Dr. Cambridge's final note of record, dated February 4, 2003 relates that Mr. Fisher was "befuddled and frustrated" because of the ALJ's ruling denying him benefits. (Tr. 346). He explained that he

read the doctor's letter, and the doctor who examined him did not take into account Dr. Lack's diagnosis, my diagnosis, or the diagnosis done independently in New Haven. John did have a rotator cuff tear. The shoulder was repaired. He has had several operations to his shoulder. He has degenerative arthritis of the ankle secondary to an old motorcycle injury. He did fracture his tibia and he has a malunion that has led to the arthritis. The patient also has chronic back problems. He is essentially unemployable.

He ambulates with a cane in the right hand which is not the recommended use of the cane considering he has right-sided lower extremity injuries. He holds the cane in his right hand because his left shoulder is compromised with a rotator cuff tear. It just makes good sense for him not to use the left shoulder as a weightbearing joint; although, this provides some awkwardness with the cane.

(Tr. 346). He concluded that he "wholeheartedly recommend[s]" that he receive social security disability benefits. (*Id.*).

### III. STANDARD OF REVIEW

■ In reviewing a decision of the [Commissioner] under § 405(g), the district court performs an appellate function. *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir.1981); *Igonia v. Califano*, 568 F.2d

*Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).

1383, 1387 (D.C.Cir.1977). A reviewing court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir.1998). *See also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990)("As a general matter, when we review a decision denying benefits under the Act, we must regard the [Commissioner's] factual determinations as conclusive unless they are unsupported by substantial evidence") (citations omitted). "Substantial evidence" is less than a preponderance, but "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). *See Yancey v. Apfel*, 145 F.3d 106, 110 (2d Cir.1998); *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.1988).

In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See also State of New York v. Sec'y of Health and Human Servs.*, 903 F.2d 122, 126 (2d Cir.1990)(stating that the court, in assessing whether the evidence which supports the Commissioner's position, is required to "review the record as a whole") (citations omitted). Still, the ALJ need not "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981). The standard should be applied in light of the fact that the Act "is a remedial statute, to be broadly construed and liberally applied." *Gold v. Sec'y of Health Educ. & Welfare*, 463 F.2d 38, 41 (2d Cir.1972) (citations omitted).

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert*, 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 404.1520 (2005). First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.* § 404.1520(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.* §§ 404.1520(a)(4)(iii); Pt. 404, Subpt. P. App. 1. If so, the disability is granted. If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work. *Id.* § 404.1520(a)(4)(iv). If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists which the claimant has the residual functional capacity to perform. *Id.* § 404.1520(a)(4)(v). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990); *Berry*, 675 F.2d at 467.

While the claimant bears the burden of proving the first four steps, the Commissioner must prove the final one. *Berry*, 675 F.2d at 467. Thus, if the claimant is successful in showing that he is unable to continue his past relevant work, "the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986).

## IV. DISCUSSION

Following the five-step analysis, the ALJ first admits that Mr. Fisher has not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 28). While he also concedes that Mr. Fisher has an impairment or combination of impairments considered "severe", he does not agree that these medically determinable impairments meet or medically equal one of the listed impairments in Appendix 1, Subpart P of the regulations.[11] (*Id.*). To proceed to the fourth and fifth steps, the ALJ found that Mr. Fisher has the RFC to "lift/carry up to 10 pounds occasionally, sit up to 6 hours and stand/walk up to 2 hours in an 8–hour workday." (*Id.*). Based on this RFC and the Grid, the ALJ determined that, while he could not perform his past work, Mr. Fisher could perform substantial gainful alternative employment. (Tr. 28–29).

The plaintiff argues that the RFC formulated by the ALJ is not supported by substantial evidence in the record as a whole. (Pl.'s Mem. Supp. Mot., 9/16/03, at 5). Specifically, he postulates (1) that the ALJ improperly evaluated the opinion of the treating physician and (2) that the ALJ erred when he discounted the claimant's account of pain. (*Id.* at 5, 9). The court disagrees and finds that the ALJ's RFC assessment is supported by substantial evidence.

 The regulation pertaining to the evaluation of opinion evidence states that a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evi-

dence in [the] case record." 20 C.F.R. § 404.1527. Moreover, "a treating physician's retrospective diagnosis and opinion are entitled to controlling weight unless they are contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Campbell v. Barnhart*, 178 F.Supp.2d 123, 127 (D.Conn.2001)(*citing Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir.1991); *Wagner v. Sec'y of HHS*, 906 F.2d 856, 862 (2d Cir. 1990)).

The plaintiff points to Dr. Cambridge's notes of April 27, 2001 and January 23, 2002 where, after briefly outlining his condition, he describes Mr. Fisher as "unemployable". (Pl.'s Mem. Supp. Mot., 9/16/05, at 5–6). However, he fails to demonstrate how this opinion is well-supported by acceptable clinical and diagnostic techniques and is not inconsistent with the substantial evidence in the record. The court finds that the opinion is not well-supported and is inconsistent with the substantial evidence in the record, particularly with Dr. Cambridge's own prior progress notes.

Dr. Cambridge's April 27th entry is the first mention of his belief that the plaintiff is unemployable—over a year after Mr. Fisher initially applied for disability benefits. (*See* Tr. 20, 273, 297). Pre–February, 2000, Dr. Cambridge believed that Mr. Fisher needed a new job that did not require heavy lifting for eight hours a day. (*See* Tr. 229–30). Certainly, implicit in the opinion that he needed a new job is the thought that he *was capable* of performing another job. Even after the alleged onset date, Dr. Cambridge's notes indicate that Mr. Fisher "continues to work doing masonry work," "continues to do heavy

---

11. At the hearing before the ALJ, Attorney Mandell briefly contended that Mr. Fisher met one of the listings, (Tr. 36), but makes no mention of this in his brief. While it is not at all clear from the transcript exactly which listing Attorney Mandell believes Mr. Fisher satisfies, the court is not convinced. As such, the court finds that Mr. Fisher's conditions do not satisfy any listing in Appendix 1, Subpart P of the regulations.

work," but that despite his "high tolerance for pain," "[i]f he continues to do heavy manual labor, we will in all likelihood reexplore the shoulder and remove more thickened fibrotic bursa." (Tr. 235). Implicit in the latter statement is the proposition that if Mr. Fisher does not continue to heavy manual labor, a reexploration of the shoulder might not be necessary. Notably, the dependant clause references *heavy manual* labor, not *all types* of labor, indicating that Mr. Fisher is not unemployable. Remarkably, as late as February of 2001, a mere two months before the April 27th entry, Dr. Cambridge noted that Mr. Fisher "has done well" after surgery and that he "will resume normal activities." (Tr. 279, 295). It appears to be no coincidence that the April 27th report is the first to be carbon-copied to Attorney Mandell. (*See* Tr. 273, 297).[12]

Furthermore, Dr. Cambridge's notes indicate that, less than a month before the ALJ's hearing, Mr. Fisher visited his office complaining of shoulder discomfort "from lifting his father repeatedly." (Tr. 302). While the court does not fault Mr. Fisher for taking care of his infirm father—in fact it salutes him in this regard—it finds that his claim that he was "disabled" and "unemployable" at that time to be entirely incredible. Dr. Cambridge's assessment of unemployability is not supported by the substantial evidence in the record. Indeed, it is not even supported by his own progress notes.

In addition, Dr. Cambridge's RFC assessment is not inconsistent with the ALJ's finding of a capacity to perform the full range of sedentary work. (*See* Tr. 29, 297). The regulations define "sedentary work" as involving

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a). In addition, the SSA has defined "occasionally" as meaning occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles. SSR 83–10.

In the same notes that described Mr. Fisher as unemployable, Dr. Cambridge remarked that while he has difficulty climbing stairs and walking distances, Mr. Fisher is capable of pulling or lifting any objects weighing ten to fifteen pounds. (Tr. 297). Moreover, Dr. O'Brien, on whom the plaintiff relies for his assessment that Mr. Fisher is "significantly limited", surmised, consistent with the ALJ's determination, that he "is able to lift 10 pounds ... can stand for less than two hours, sit alternating with standing on a regular basis ... [but] is limited in his upper and lower extremities for pushing and pulling." (Tr. 339). In addition, the RFC assessments of Drs. Khan and Lorenzo describe an individual with a greater

---

12. The court believes that Dr. Axline was not far off when he stated that he "think[s] Dr. Cambridge is trying to help this man by putting the medical problems in the worst possible light." (Tr. 50).

RFC than the ALJ ultimately found. (*See* Tr. 247, 259).

Only a moderate amount of medical evidence supports Dr. Cambridge's findings. None of his progress notes contain medical support for the proposition that Mr. Fisher is unemployable. Moreover, his opinion of total disability is inconsistent with the other substantial evidence in the record including his own prior progress notes and the activities in which Mr. Fisher participates that are described therein. As such, the ALJ did not violate the treating physician rule in disregarding Dr. Cambridge's opinion of total disability. Indeed, the ALJ's RFC assessment was not inconsistent with Dr. Cambridge's own notes regarding the same. The court is not convinced by the plaintiff's argument and finds that the ALJ properly evaluated the opinion of the treating physician in this case.

■ Second, the plaintiff argues that the ALJ erred when he discounted the claimant's account of pain. (Pl.'s Mem. Supp. Mot., 9/16/03, at 9). In evaluating subjective allegations of pain, the ALJ is required to consider:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

20 C.F.R. § 416.929. Subjective reports will not alone establish a disability; objective medical evidence must also be present.

20 C.F.R. § 404.1529(a)("... there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged....").

The inquiry here is not whether the plaintiff experiences pain. The court does not doubt that he does. The inquiry is whether he experiences such pain as to preclude other employment. The court finds that he does not. The plaintiff himself admitted that he possessed a "high tolerance for pain." (Tr. 235). Second, despite this allegedly debilitating pain, the plaintiff continued lifting heavy objects at work, building stone walls, and repeatedly lifting his father. Moreover, none of the objective medical evidence suggests that Mr. Fisher's symptoms are so severe as to preclude employment. The court finds that substantial evidence exists which suggests that Mr. Fisher is capable of performing other work and, consequently, that the ALJ properly discounted his account of pain.

Based upon the foregoing, the court finds that, contrary to the plaintiff's contention, the RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. Therefore, the plaintiff's motions for reversing the decision of the ALJ, or in the alternative, remanding for a new hearing (Dkt. #7) should be **DENIED**. Accordingly, the defendant's motion for an order affirming the decision of the Commissioner (Dkt. #10) should be **GRANTED**. The decision of the Commissioner should be affirmed.

The plaintiff may timely seek review of this recommended ruling in accordance with Rule 72(b) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 72(b). Failure to do so may bar further review. 28 U.S.C. § 636(b)(1)(B); *Small v. Sec'y of*

*Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

IT IS SO ORDERED.

Dated Feb. 11, 2005.